COURT   ORIGINAL

Free Lazor C73842
Box 1050 D5-126
Soledad, California 93960

SELF-REPRESENTED WITHOUT
A BAR ATTORNEY

**FILED**

**JUL 20 2016**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

By _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA - SACRAMENTO

Free Lazor,

Plaintiff,

vs

David S. Wildman, et al

Defendants

No. 2:16-cv-0461 CKD P (TKD)

AMENDED/CORRECTED OBJECTIONS TO
MAGISTRATE JUDGES FINDINGS AND
RECOMMENDATIONS, AND REQUEST FOR AN
EVIDENTIARY HEARING

Comes Now Free Lazor, Plaintiff as follows:

On 7-15-16, right on his court-ordered date pursuant to the "mailbox rule," Plaintiff sent his objections to Magistrate's Findings and Recommendations, ect, but he has discovered just a day later that certain latter pages of his objections, etc were not copied/included in his pleading sent to the court, by mistake and inadvertence, and also at least one or two of the exhibits were missing in that mailing/filing.

Wherefore Plaintiff now presents this pleading, the same except with the missing pages here, he requests the court to accept this instant version in lieu of the previous one sent on 7-15-16, to supplant that with this, nullify or de-file the first one and file and act on this one instead of the earlier one.

Dated: 7-16-16

Respectfully presented

Free [signature]

ORIGINAL

Free Lazor  C73842
Box 1050  D5-126
Soledad, California  93960

Without Bar Attorney,
Self-Represented

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

Free Lazor,                          No. 2:16-cv-0461 CKD P (TKD)

Plaintiff,

vs.                                  OBJECTIONS TO MAGISTRATE JUDGE'S

David S. Wildman et al.,             FINDINGS AND RECOMMENDATIONS, AND

Defendants                           REQUEST FOR AN EVIDENTIARY HEARING

Comes Now Free Lazor, Plaintiff, with objections to Magistrate Judge's

findings and recommendations issued by M.J. Delaney on 4-4-16, as follows:

1. A PRELIMINARY MATTER: The court papers reflect someone at the court changing plain-

tiff's name to "P.F. Lazor"; in contrast to Free Lazor being the only correct name.

Plaintiff's name has never been P.F. Lazor. Years ago it was PF Lazor (but never

PF Lazor nor P.F. Lazor either). The F of PF was from inception derived from

Free, only the P has been deleted. The correct name, and only correct name is

[both?] Free Lazor, and Plaintiff objects to all others including PF Lazor, P.F. Lazor,

PF LAZOR, P.F. LAZOR, FREE LAZOR. He requests the court word it correctly.

2. SUBSTANTIVE MATTERS AS TO THE MERITS OF THE COURT'S ORDER(S) AND THESE OBJECTIONS:

For purposes of avoiding confusion in this objections document, Plaintiff will refer to the court's

order of 3-10-16 as "ORDER-1" and the "order and FER's" of 4-4-16 as "ORDER-2."

3. IN ORDER-1, THE MAGISTRATE-JUDGE (hereinafter "MJ") denied Plaintiff's attempts to

prosecute this action on the basis that Plaintiff, in order to proceed without prepayment of

1  fees must make a "plausible allegation"... that he is under imminent danger of physical

2  injury... [and that] there is no such allegation."

3    That finding is factually incorrect, as plaintiff will demonstrate momentarily.

4    The MJ consequently concluded that plaintiff could proceed only if he could forthwith

5  pay a $400 filing fee, because of being "struck out" under 28 USC §1915 (g) based on

6  a 1997 case Lazor vs McCluskey. Although plaintiff understands that this appears on

7  its face to be a correct application of the §1915 statute, he objects to this conclusion

8  also as being erroneous both factually and as a matter of law, based on underlying

9  factors that the MJ doesn't have knowledge of presently; plaintiff will, below, impart those

10  factors with arguments supporting his objections, so that the MJ (and judge) will now, for

11  the first time, have the benefit of those factors (facts and related information). plaintiff will

12  argue (below) the law, and common sense, as applied to those factors, ~~presented~~ (below)

13  in support of his objections seeking an opposite ruling and/or F.&.Rs.

14    But first, as to the matter of supposedly not alleging imminent physical injury by

15  plausible allegation, plaintiff presents the following contrary facts and objections:

16    4.  It is factually erroneous to say plaintiff failed to raise whatsoever a plausible

17  allegation of imminent physical injury in his original complaint. In fact, he did raise such

18  an allegation. Granted, it may not be the most traditional type of or circumstance of imminent

19  physical injury, yet it is in fact both physical injury and imminent; it even is more than

20  merely "imminent" in that it has happened (ie, the physical injury) since his complaint

21  was filed some five months ago and this physical injury (serious physical injury) is

22  continuing to occur today and ongoing beyond today, which will satisfy that component

23  of this requirement (the facts explained momentarily). As to the other component (= whether

24  there is injury involved (imminently) and whether it is "physical", and impliedly

25  substantial enough to meet the requirement ~~of~~ the intent of the statute, this is also a

26  resounding, emphatic "yes" that plaintiff has met this burden, as will be shown.

27    And lastly, as to the underlying purpose of the statute's exception of allowing

28  plaintiff to proceed based on imminent physical injury, plaintiff fulfills this (injury) requirement, as

2

WELL, TO WIT:

5. HERE IS WHAT PLAINTIFF STATED IN HIS COMPLAINT THAT FULFILLS THE EXCEPTION REQUIRE-MENTS OF §1915(g) "IMMINENT PHYSICAL INJURY," ALBEIT NOT THE CLASSIC, CONVENTIONAL CLAIM, IT WOULD NOT BE PROPER NOR LAWFUL TO LIMIT A CLAIM TO THE CLASSIC, CONVENTIONAL MODE. PLAINTIFF'S COMPLAINT STATED:

"[DEFENDANTS ARE] ACTUALLY CAUSING PLAINTIFF'S MURDER IN THE FIRST DEGREE BY EVERY DAY OF IMPRISONMENT CUTTING YEARS OFF THE END OF HIS LIFE BY GMO & DEAD TOXIC FOODS & WATER DISPLACING LIFE-GIVING ORGANIC LIVE FOODS & ENERGY WATER HE'D BE INGESTING EVERY DAY WHEN FREE FROM THIS KIDNAPPING [CAUSED BY DEFENDANTS, AT THE HEART OF THIS SUIT'S CLAIMS]"
                    — P 3, SECTION IV, ¶ I COMPLAINT.

PLAINTIFF CONTINUES ON WITH MORE DETAIL AND MORE DIRECTLY:

"EVERY HOUR AND EVERY DAY IN CDCR, PLAINTIFF IS IN JEOPARDY IMMINENTLY OF THIS BODILY DESTRUCTION & PAIN-INFLICTING DEATH BY DISEASE, AND IT EVEN GOES BEYOND "IMMINENT JEOPARDY" AS IT IS ACTUALLY CARRIES ON DAILY: ACTUALLY KILLING BY PREMATURE DEATH, THAT CANNOT EVER BE REVERSED, THOUGH THE FINAL DEATH IS NOT YET CONSUMMATED,..."


5. PLAINTIFF HAS "EXPERT WITNESSES" PREPARED TO TESTIFY AND PRESENT UNASSAILABLE, UNREBUTTABLE SCIENTIFIC EVIDENCE THAT WOULD PASS THE COURTS MOST RIGID MUSTER AND REQUIREMENTS TO SHOW THAT THE GMO-BASED, AND TOXIC LADEN AND NUTRITIONLESS DIET PLAINTIFF HAS BEEN FORCED TO IN-GEST (OR BE TUBE FORCE-FED SAME), AND TOXIC WATER HE HAS BEEN FORCED TO INGEST SINCE THE FILING OF THIS SUIT WAS FILED HAVE ACTUALLY SHORTENED HIS LIFESPAN ALREADY (PREMATURE DEATH / ARGUABLY MANSLAUGHTER OR OTHER HOMICIDE OR THE EQUIVALENT OF IT), AND THAT EVERY DAY ONWARD FROM TODAY INTO THE FUTURE AS LONG AS IN CDCR, THAT THIS TORTURE-PREMATURE-DEATH CONTINUES BY EVERY PASSING DAY SHORTENING HIS LIFESPAN. IT IS TORTURE BECAUSE THE UNAVOIDABLE DISEASES THIS INFLICTS ARE OF A NATURE THAT INSEPARABLY ARE OF PHYSICALLY PAINFUL SUFFERING. IF SUCH PAINFUL FATAL DISEASE EXPERIENCES THAT ABSOLUTELY WILL AND IS NOW, EACH DAY TAKING DAYS OF

1   PLAINTIFF'S VERY LIFE BY PHYSICAL, BODILY HARM AND DAMAGES, NOT "IMMINENT PHYSICAL

2   INJURY," THEN WHAT WOULD BE? PLAINTIFF'S LINED-UP EXPERTS INCLUDE DR JEFFREY SMITH,

3   THE WORLD'S FOREMOST EXPERT ON GMO (GENETICALLY MODIFIED ORGANISMS) FOODS, AND

4   WILLIAM ENGDAHL, ONE OF THE WORLD'S MOST RESPECTED GEOPOLITICAL EXPERTS ALSO RENOWNED

5   FOR HIS RESEARCH AND AUTHORED BOOKS AND SCIENTIFIC PAPERS ON GMO "PHYSICAL INJURY."

6   (PETITIONER HAD POSSESSED 2 OF THE BIBLE OF THE SUBJECT" BOOKS BY JEFFREY SMITH,

7   WITH INFORMATION TO ATTACH TO THIS PLEADING, BUT BOTH WERE STOLEN AND DESTROYED BY

8   SGT. M. DAVES AT KERN VALLEY STATE PRISON (KVSP), ADMITTED TO BY KVSP STAFF, NOT DENIED

9   AS THEIR EMAILS TO PLAINTIFF'S ATTORNEY AT THE TIME (WILLIAM ROBINSON AT SANTA CLARA

10  APPELLATE PROJECT), GATHERED THESE EMAILS ADMITTING THIS ACT OF EVIDENCE DESTRUCTION).

11      6. IN ADDITION TO THIS EVIDENCE GENERALLY, PLAINTIFF ALSO HAS PREPARED ONE OF THE TEN

12  TOP EXPERTS IN THE WORLD ON FLUORIDE (AND CHLORINE) TOXICITY AND "CHEMICAL HYPERSENSITIVITY"

13  OR MULTIPLE CHEMICAL SENSITIVITY (MCS) AS IT'S FREQUENTLY CALLED, DR RICHARD R. KUNIN, MD

14  OF SAN FRANCISCO, WHO HAS BEEN PLAINTIFF'S PERSONAL PHYSICIAN FOR 37 YEARS, WHO HAS

15  SCIENTIFICALLY RUN BATTERIES OF RECOGNIZED VALID TESTS ON PLAINTIFF PRIOR TO IMPRISONMENT IN THE

16  1970S AND 1980S, AS WELL AS HAVING BEEN PERSONALLY ADMITTED INTO CDC/R TO RUN

17  FURTHER TESTS AND EXAMINATIONS ON PLAINTIFF. DR KUNIN IS PREPARED TO TESTIFY THAT PLAIN-

18  TIFF SUFFERS FROM MCS/CHEMICAL HYPERSENSITIVITY TO FLUORIDE, CHLORINE, AND OTHER CHEM-

19  ICAL ELEMENTS IN THE PRISON WATER THAT IS ACTUALLY SHORTENING PLAINTIFF'S LIVES ON BY

20  DISEASE INFLICTION WHICH IS PAINFUL AND CONSTITUTES "PHYSICAL INJURY" TO EXTREME, BY

21  ANY STANDARD. DR KUNIN'S TESTIMONY, SCIENTIFICALLY BASED AND MEDICALLY VALIDATED, AS SO

22  PLAINTIFF'S INDIVIDUAL CASE, WOULD PASS THE MUSTER OF VALID EVIDENCE TO STAND UP IN ANY

23  COURT OF LAW OR EQUITY. (SEE EXHIBIT A; DR RICHARD KUNIN LETTER AND HIS "BIO" CREDENTIALS)

24      7. PLAINTIFF ALSO HAS PREPARED OTHER EVIDENCE TO PROVE HE IS BEING GROSSLY "PHYSICAL-

25  LY INJURED" WITH EXCRUCIATING PHYSICAL PAIN, SUFFERING AND PREMATURE-DEATH, LIFESPAN

26  REDUCTION INFLICTION EVERY DAY THAT HE'S IN PRISON, THEREBY MEETING THE REQUIREMENTS

27  OF SECTION 1915(g) FOR EXEMPTION FROM A PLEA BAR IN THIS CASE. PLAINTIFF CAN READILY,

28  EASILY PROVE BY ANY REASONABLE AND EVEN MOST RIGID STANDARDS OF PROOF THAT THE

ONLY THING KEEPING PLAINTIFF IN PRISON IS PSYCHOLOGIST WILLIAMS MALICIOUS DELIBER-
ATELY FALSE PSYCH REPORT AND THE BPH RELYING ON IT TO HAVE FORECLOSED PLAINT-
IFF'S OTHERWISE MANDATORY PAROLE RELEASE FROM PRISON MONTHS AGO. PLAINTIFF CAN ALSO
PROVE, AND HAS THAT EVIDENCE PREPARED FOR TRIAL THAT IF FREE, AND WHEN FREE, NOT
IMPRISONED IN CDCR'S WALLS, THAT HE NEVER WOULD INGEST ANY OF THESE TOXIC, NUTRI-
TIONLESS AND GMO-LADEN FOODS AND WATER, BUT THAT HIS STRICT LIFESTYLE AND DIET
AND WATER CONSISTS ABSOLUTELY ONLY OF THE MOST PURE, ENERGY RICH, NUTRITION-RICH,
NON-TOXIC, TRU-ORGANIC, NATURAL FOODS EXCLUSIVELY, AND PURE ENERGY (JOHN ELLIS)
WATER.

B. JUST ONE OF HUNDREDS OR THOUSANDS OF EXAMPLES OF PLAINTIFF HAVING A PHYSICAL
EVEN CONGENITAL (OR INFANT-PERIOD DAMAGED) BODILY SYSTEM THAT SUFFERS THESE DAMAGES
FROM THESE FOODS AND WATER CHEMICALS SOLELY TO BEING IN CDCR, WHEN OTHER PRISONERS
DON'T SIMILARLY SUFFER THESE REACTIONS AND CONSEQUENT PHYSICAL INJURIES AND PRE-
MATURE DEATH ACTUAL INFLICTION, IS WHERE ALL CSP-LAC PRISONERS WERE SUBJECTED
TO CDC MAINTENANCE STAFF PUTTING 1-3 PPM (PARTS PER MILLION) BROMINE (A HALOGEN
IN THE SAME FAMILY AS FLUORIDE AND CHLORINE IN THE PRISON AND PUBLIC WATER) IN CELL VENTS
WHILE A
PLAINTIFF WAS THERE IN THE YEAR 2001 OR 2002. OF OVER SAME 5000 PRISONERS THERE
AND SUBJECTED TO THE SAME BROMINE INHICATION THROUGH THE CELL VENTS, PLAINTIFF
WAS THE ONLY PRISONER WHO SUFFERED THE MOST EXCRUCIATINGLY PAINFUL MUSTARD-GAS-
LIKE EFFECT SERIES OF PHYSICAL PAIN AND DAMAGES; MORE PAINFUL THAT ALL OTHER PHYSICAL
PAIN PLAINTIFF HAS EVER EXPERIENCED IN HIS LIFE, CUMULATIVELY, AS FOR DAYS HE LITERALLY
SCREAMED IN PAIN WITH BLANKETS COVERING HIS HEAD & BODY TO MUFFLE THE DAY & NIGHT
SCREAMS SO OTHERS COULD SLEEP — IT ALMOST FORCED PLAINTIFF TO SUICIDE, RESULTING IN
DENTISTS RIPPING OUT HIS TEETH IN FRANTIC EFFORT TO DETERMINE THE SOURCE OF THE TOXIC
POISONING, AND EVENTUAL 100% LOCKJAW WHERE NO AMOUNT OF FORCE COULD OPEN HIS
JAW SO HE COULD EAT OR DRINK. THIS WAS DURING A TOTAL LOCKDOWN WHERE PLAINTIFF
COULD NOT GET OUT OF HIS CELL EVEN WHEN AT THE POINT OF FORCED SUICIDE FROM THE PHYSICAL
PAIN. THIS IS JUST ONE SAMPLE, OF HUNDREDS OF OTHERS OF PLAINTIFFS' UNIQUE OR OVER-

1   UNIQUE STATUS OF HIS PHYSICAL/BODILY CONDITIONS THAT RESULT IN "PHYSICAL INJURY"

2   THAT OTHER PRISONERS ARE NOT SUSCEPTABLE TO EVEN BY EXPERIENCING AND BEING SUBJECT-

3   ED TO THE SAME (OUTWARD) CONDITIONS OF GMOS, FLUORIDE, TOXICITY CONTACT, ETC.   IF

4   THIS DOES NOT CONSTITUTE "PHYSICAL INJURY," WHAT WOULD — DESPITE NOT BEING OF THE

5   MOST "CONVENTIONAL" OR TYPICAL "PHYSICAL INJURY" PRESENTATION, THE STATUTE DOES NOT

6   LIMIT TO CONVENTIONAL OR ANY PARTICULAR TYPE OF "PHYSICAL INJURY," AS FAR AS THE

7   "IMMINENT" REQUIREMENT, ITS NOT ONLY WITHIN THE QUINTESENTIAL CONVENTIONAL EXAMPLE

8   OF "IMMINENTLY" ABOUT TO OCCUR, BUT HAS BEEN THAT AND THEN GONE BEYOND "IMMINENT"

9   TO BE ACTUALLY OCCURRING PRESENTLY, AND OCCURRING EVERY DAY AND EVERY HOUR FROM THE

10   DAY THIS SUIT WAS FILED, UP TO THE PRESENT AND CONTINUING ON INDEFINITELY (AS LONG AS

11   PLAINTIFF IS IN CDCR UNLESS A UNIQUE PROGRAM OF DIET AND WATER WERE ESTABLISHED BY CDCR

12   FOR PLAINTIFF, WHICH HAS NOT HAPPENED IN 33 YEARS, DESPITE EFFORTS BY PLAINTIFF FOR DECADES

13   TO ACHIEVE THIS,

14   9. IN ADDITION TO ALL OF THE ABOVE GENRE OF "PHYSICAL INJURY" AND "IMMINENCE," PLAIN-

15   TIFF HAS BEEN CONTINUALLY SUBJECTED TO PHYSICAL VIOLENCE ASSAULTS AND BATTERY, EVEN ONES

16   THAT HAVE LEFT HIM PERMANENTLY BRAIN DAMAGED (TBI) BY PRISONERS AT EVERY TURN SET

17   UP BY CDCR PRISON GUARDS — THEREFORE PLAINTIFF LACKS THE USUAL "PROTECTION" OTHER

18   PRISONERS WHO ARE SUBJECT TO ASSAULTS HAVE FROM CDCR STAFF. CDCR STAFF CONTINUE TO

19   INSIST ON DOUBLE CELLING PLAINTIFF, DESPITE PROOF THAT PLAINTIFF INNATELY IS OF A SPIRITUAL

20   DIFFERENCE FROM VIRTUALLY 100% OF ALL OTHER CDCR PRISONERS WHICH CAUSES AN INSUPER-

21   ABLE CLASH THAT UNAVOIDABLY INVOKES SPIRITUAL-BASED HOMICIDAL RAGE, HATE, TERRORISM,

22   SADISTIC EVIL FROM VIRTUALLY ALL CELLMATES ONCE PUT IN ONE OF THESE ENCLOSED CONCRETE

23   BOXES (CELLS) WITH PLAINTIFF.   33 YEARS HAVE PROVEN THIS CONDITION THAT HAS HAD ESSEN-

24   TIALLY NO EXCEPTION, IS NOT GOING TO SUDDENLY CHANGE, THE IMMINENCE OF PHYSICAL

25   VIOLENCE, WITH THREATS OF VIOLENCE RIGHT UP TO THE PRESENT HAVE CONTINUED, SOLELY, AGAIN,

26   DUE TO DEFENDANTS WILDMAN AND BPH AGENTS, ILLEGALLY KEEPING PLAINTIFF IN CDCR IM-

27   PRISONMENT, BY THE FRAUDULENT, FALSE, MALICIOUS, MERCENARY, LIBELOUS PSYCHOLOGICAL EVALUATION

28   REPORT USED IN A CONSPIRACY BY BPH AGENTS TO STOP PLAINTIFF'S OTHERWISE MANDATORY PAROLE RELEASE.

10. OUT OF SEQUENCE MATTER, SHOULD HAVE BEEN PLACED PRIOR TO #9, JUST ABOVE:

PLAINTIFF ALSO SUFFERS FROM A FAIRLY RARE AND RATHER EXTREME DEGREE OF "HYPER-ACUSIS" CAUSED BY DEFENDANTS' AGENTS, BY THEIR PLOTTING OUT AND EXECUTING A VIOLENT PHYSICAL ATTACK ON PLAINTIFF, SMASHING AND STOMPING AND KICKING HIS HEAD TRAUMATICALLY ON 11-10-2001, (SEE EXHIBIT B, FOR HYPERACUSIS GENERAL INFORMATION). THIS CONDITION IS WELL-ESTABLISHED IN PLAINTIFF'S MEDICAL FILES, PRIMARILY IN THE SECTIONS CONTAINING AUDIO/HEARING DAMAGE INFORMATION.

11. PLAINTIFF'S POINT HERE IS NOT (AT LEAST PRIMARILY NOT) THAT PLAINTIFF SHOWS A VIOLENT STAFF SET-UP BY CDCR STAFF USING INMATES TO BRUTALIZE PLAINTIFF TO EXTREME FOR PURPOSES OF "PHYSICAL INJURY" IN ITSELF, EVEN THOUGH THAT PATTERN CONTINUES TO THE RECENT PRESENT, BUT RATHER THIS HYPERACUSIS MATTER IS PRESENTED HERE FOR THE MAIN PURPOSE OF PROVIDING ANOTHER BASIS ASIDE FROM DEMONIC SPIRITUAL WARFARE INFLICTED BY DEMON-POSSESSED CELLMATES BENT ON VIOLENCE, FOR THE UNCANNY, UNUSUAL AMOUNT OF VIOLENCE PLAINTIFF HAS SUFFERED AND SUFFERS AT THE HANDS OF HIS CELLMATES. PLAINTIFF'S HYPERACUSIS MAKES SOUNDS THAT SOUND LIGHT, INNOCUOUS, OR NOT-EVEN NOTICED AS EXIST-ING TO THE NORMAL EAR AND BRAIN (NERVOUS SYSTEM), A TORTURE-LEVEL PAIN THAT STRIKES PLAINTIFF LIKE A HIGH-VOLTAGE CATTLE PROD TO HIS BRAIN AND HEART, LIKE BEING STRUCK BY LIGHTENING; WITH MOST OR ALL CELLMATES, DOZENS OF TIMES DAILY. EVEN WHERE PLAINTIFF SAYS NOTHING, HIS INVOLUNTARY BODY JOLTING AND RELATED SPONTANEOUS BODILY REACTIONS PISS OFF AND DRIVE TO ANGER, RAGE AND VIOLENCE MOST CELLMATES, IN ADDITION, CELLMATE SNORING, WHICH IS DONE BY ABOUT 98% OF ALL PLAINTIFF'S CELLMATES, (AND EVEN THEIR "MERE" HEAVY BREATHING) THAT'S INNOCUOUS OR NOT EVEN HEARD BY MOST PEOPLE, TRAUMA-TIZES PLAINTIFF'S WHOLE BODY AND NERVOUS SYSTEM AS A FORM OF PTSD-TERROR LIKE EX-PERIENCE ("PRESENT" NOT "PAST"), AND FORCES PLAINTIFF TO WAKE THE SNORING/HEAVY BREATH-ING CELLMATE COUNTLESS TIMES DAY AND NIGHT, AS THE ONLY WAY TO COPE WITH THIS SITUA-TION. THIS, IN TURN, EVOKES RAGEFUL VIOLENCE FROM ALMOST ALL CELLMATES, PUTTING PLAIN-TIFF PRESENTLY IN A POSITION OF "IMMINENT PHYSICAL INJURY" OF CELLMATE VIOLENCE SPECIFICALLY THREATENED AND ALMOST ACTED ON IN THE PAST 30 HOURS.

PART II

OTHER BASES OF OVERCOMING § 1915 (g) PROCEDURAL BAR

12. ASIDE FROM PLAINTIFF MEETING THE "IMMINENT PHYSICAL INJURY" REQUIREMENT, OR ASIDE FROM THAT ISSUE WHETHER THE COURT SIDES WITH PLAINTIFF OR NOT ON THAT MATTER, PLAINTIFF HEREBY PRESENTS A SET OF TOTALLY DIFFERENT STAND-ALONE BASES FOR OVERCOMING THE § 1915(g) PRO-CEDURAL BAR, THESE INCLUDE THE FOLLOWING LEGAL CATEGORIES OF ISSUES OR SUB-ISSUES:

(A) PLAINTIFF' 3-STRIKES STATUS WAS ACHIEVED BY "FRAUD" COMMITTED BY RESPONDENTS/DEFENDANTS AND THEIR COUNSEL ATTORNEY GENERAL; WHICH FRAUD NULLIFIES ALL 3-STRIKES JUDGMENTS;

(B) PLAINTIFF' 3-STRIKES STATUS IS INVALID AS BEING AT ODDS WITH THE INTENT AND PURPOSES OF THE 3-STRIKES LAW (STATUTE AND RELATED STATUTES);

(C) PLAINTIFF WAS FORCED AGAINST HIS WILL TO BE IN A FACTUAL "3 STRIKES" POSITION THAT RESULTED IN HIS "3 STRIKES" STATUS, ILLEGALLY BROUGHT ABOUT BY RESPONDENTS/DEFENDANTS;

(D) AS APPLIED TO PLAINTIFF, AND NOT NECESSARILY OTHERWISE GENERALLY, THE 3-STRIKES PROCEDURAL BAR IN THIS CASE IS UNCONSTITUTIONAL, INCLUDING THAT IT COMPLETELY BARS PLAINTIFF FROM FIRST AMENDMENT AND COMMON-LAW RIGHT OF ACCESS TO THE COURTS AND TO ANY REDRESS OF GRIEVANCE REMEDY; DUE TO NO FAULT OF HIS OWN, INCLUDING NO FAILURE OR WRONG ON HIS PART IN BEING SUBJECTED TO 3-STRIKES STATUS.

EACH OF THESE FOUR GROUNDS WILL NOW BE ADDRESSED SEPARATELY; PLAINTIFF ARGUES THAT EACH STANDS ALONE ON ITS OWN AS CAUSE TO OVERCOME THE 3-STRIKES BAR IN HIS PARTICULAR CASE, ON A CASE-BY-CASE BASIS OF DETERMINATION, TO WIT:

13. (A) PLAINTIFF' 3-STRIKES STATUS WAS ARRIVED AT BY "POSITIVE FRAUD" AND EGREGIOUS CRIMINALITY ON THE PART OF RESPONDENTS (INCLUDING THEIR PREDECESSORS IN OFFICE) AND THEIR ATTORNEY GENERAL COUNSEL; WHICH FRAUD VITIATES AND NULLIFIES ALL 3 STRIKES JUDGMENTS AND DETERMINATIONS AGAINST PLAINTIFF, AS BEING VOID FROM INCEPTION.

1   IT IS SO WELL ESTABLISHED IN AMERICAN JURISPRUDENCE THAT "FRAUD VITIATES AND

2   NULLIFIES ALL JUDGMENTS BASED UPON IT AS VOID FROM INCEPTION," THAT ELABORATE ARGUMENTS

3   IN SUPPORT OF THIS CONTENTION ARE UNNECESSARY.' SEE HAZEL ATLAS-GLASS COMPANY LINE OF-

4   CASE IN THE 1800s, STILL "GOOD LAW" TODAY, AND SEE THOSE DECISIONAL CASES' PROGENY

5   UP TO THE PRESENT ERA — NO SIGNIFICANT CHANGE IN THAT PRINCIPLE OF LAW, (PLAINTIFF IS

6   PROHIBITED FROM LAW LIBRARY ACCESS TO LOOK UP THIS CASELAW AND STATUTES, ETC, AS LAW

7   LIBRARY ACCESS IN CALIFORNIA LEVEL 4 PRISONS HAS BEEN REDUCED TO A TOTAL FARCE OF

8   VIRTUALLY TOTALLY BARRED ACCESS FOR YEARS RUNNING, AND PLAINTIFF IS COMPUTER-ILLITERATE AND

9   IS UNABLE TO PENETRATE HOW TO ACCESS LEGAL INFORMATION IN THE LAW LIBRARIES FOR THE PAST 5-7

10  YEARS OR SO SINCE LAW BOOKS WERE TAKEN AND REPLACED BY COMPUTERS PLAINTIFF IS UNABLE TO MAKE

11  WORK FOR HIM),

12  14. RESPONDENTS/DEFENDANTS (WHICH INCLUDES THEIR PREDECESSORS IN OFFICE) CARRIED ON A CRIMINAL CONSPIRACY

13  WHICH CONSTITUTES AND RESULTED IN FRAUD, EVEN POSITIVE FRAUD (OR ALTERNATIVELY CON-

14  STRUCTIVE FRAUD), WHICH SOLELY GAVE RISE TO THE 3-STRIKES STATUS OF PLAINTIFF, AND IN

15  FACT IS THE ENTIRE 3-STRIKES ESSENCE IN THIS RATHER UNIQUE CASE. DEFENDANTS ACHIEVED

16  THIS FRAUD BY LITERALLY THOUSANDS OF DIFFERENT ACTS COMMITTED BY BATTERIES OF HUNDREDS OF

17  CDCR EMPLOYEES, MOSTLY CCPOA CDC GUARDS, MANY ACTING IN CONCERT AND MANY ACTING INDEPEND-

18  ENTLY, BUT ALL FOCUSED ON DESTROYING PLAINTIFF'S LIFE AND IN THAT COURSE, BARRING HIS ACCESS

19  TO THE COURTS WHICH SPECIFICALLY CAUSED THE 3-STRIKES INVOCATION. IT WOULD TAKE A THICK

20  BOOK TO CHRONICLE EVEN 10% OF THE ACTS CONSTITUTING THIS FRAUD, OR A LENGTHY EVIDENTIARY

21  HEARING (WHICH PLAINTIFF WILL REQUEST, INFRA), SO BUT A FEW EXAMPLES WILL BE PRESENTED

22  HERE, TO WIT:

23        15. AS TO THE LAZAR VS MCCLUSKEY 3-STRIKES CASE CITED BY THE COURT IN ORDER-1,

24  SO WITH EVERY LEGAL CASE PLAINTIFF EVER FILED IN ANY COURT IN HIS ENTIRE LIFE, DEFENDANTS

25  COMMITTED THE FRAUDULENT ACTS OF:

26        (a) FIRST, FORCING PLAINTIFF AGAINST HIS WILL TO FILE THE CASES IN THE FIRST PLACE,

27  BY COMMITTING SO MANY ACTS OF CRIMINAL TERRORISM AGAINST PLAINTIFF, INCLUDING BRUTAL-

28  ITY, ATTEMPTED MURDERS (13+ DOCUMENTED TIMES BY CDC/R STAFF, SOLICITING INMATES TO

AD IT AND OTHER DOCUMENTED TIMES DONE DIRECTLY BY CDC STAFF), THAT HE WAS FORCED TO

FILE ALL HIS SUITS, TOTALLY RELUCTANTLY, AGAINST HIS WILL AS THE ONLY MEANS TO HAVE

TO SECURE HIS SAFETY AND SAVE HIS LIFE;

    (b) AS THE ESSENCE OF THE FRAUD ACT AND MULTI-FACETED FRAUD CAMPAIGN, ALL

OF THE HUNDREDS OF CDC STAFF INVOLVED (AT ONE COUNT OVER 1500 AT VARIOUS TIMES)

KNEW (HAD BEEN INFORMED) THAT ALL THEY NEEDED TO DO TO ACHIEVE THEIR GOAL OF STOPPING

PLAINTIFF'S ABILITY TO PROSECUTE HIS COURT ACTIONS WAS TO BOMBARD HIM RELENTLESSLY WITH

HUNDREDS AND HUNDREDS OF ACTS OF INHUMANE HARASSMENT AND TERRORISM, REPRISALS AND VINDICTIVE

ACTS OF TORMENT AND TRAUMA, THAT IT WOULD FORCE HIM TO FILE SO MANY LEGAL ACTIONS THAT

HE, AND NO HUMAN BEING, COULD POSSIBLY MAINTAIN OR PROSECUTE EVEN 1 PERCENT OF THEM,

YET FOR SAFETY'S SAKE AND THE SAKE OF STOPPING THE MASSIVE TRAUMA TOO EXTREME TO

COPE WITH WITHOUT IT DRIVING THEIR TARGET TO SUICIDE TO ALLEVIATE, HE WOULD HAVE TO

KEEP FILING MORE COURT ACTIONS (SUITS). AND THAT'S EXACTLY WHAT OCCURRED; WHILE ALL

INVOLVED COURTS REFUSED COUNTLESS MOTIONS TO RESTRAIN THE ACTIONS OF THIS SCHEME FOR

YEARS. AS THIS CAMPAIGN CONTINUED (EVENTUALLY CONSISTIVE OF OVER 20,000 ACTS OF

TERROR AND INHUMANE ABUSES AGAINST PLAINTIFF),

    (c) THE ATTORNEY GENERAL / JUSTICE DEPT. OF CALIFORNIA NOT ONLY REFUSED INTERVENTION BUT

ACTIVELY PROTECTED, ENCOURAGED AND JOINED IN WITH DEFENDANTS HUNDREDS OF ASSUED TO

INCREASE AND ESCALATE THIS ACTIVITY, AS IT CARRIED ON,

    (d) DEFENDANTS TRANSFERRED PLAINTIFF A RECORD 51 TIMES EACH TIME (2) TIME MASSIVE-

LY SABOTAGING EVERY COURT CASE HE HAD; AND CAUSING A SETBACK OF MANY MONTHS

FOR EACH OF HIS COURT CASES (FILED ACTIONS THAT BY THIS SCHEME SPOILED INTO 3-STRIKES

CASES; AND

    (e) IN ALMOST EVERY TRANSFER LOST, STOLE, DESTROYED MANY OF HIS ACTIVE COURT

CASE FILES AND YEARS OF RESEARCH AND WORK PRODUCT, THUS SABOTAGING THOSE CASES;

    (f) IMPOUNDED PLAINTIFF'S ACTIVE COURT CASES AND FILES, FOR YEARS AT A TIME, DENY-

ING HIM ACCESS TO THEM AS COURT CASES HE DIDN'T EVEN KNOW CASE NAMES OR NUMBERS FOR

(SO HE COULDN'T NOTIFY THE COURT NOR FILE APPEALS OR MOTIONS TO RESTRAIN), FELL APART WITH

EXPIRED DEADLINES AND OTHER PROBLEMS FROM THESE ACTS OF SABOTAGE;

(g) PLAINTIFF'S INCOMING MAIL WAS REPEATEDLY STOLEN BY STAFF, CONTAINING CONTENTS OF EVIDENCE, LAW AND OTHER DATA NECESSARY TO CARRY ON HIS COURT ACTIONS, AND WITHOUT WHICH HIS COURT ACTIONS WERE RUINED, THOSE LATER BECAME 3-STRIKES CASES,

(h) PLAINTIFF'S OUTGOING MAIL, BOTH LEGAL MAIL ADDRESSED TO COURTS, LEGAL ASSIST-ANTS, ET AL, AND "REGULAR MAIL" TO LAYMEN HELPING PLAINTIFF WITH KEEPING UP WITH HIS COURT ACTION DEADLINES, WERE FREQUENTLY STOLEN, AND STILL ARE TO DATE; IN 1993-94, PLAINTIFF AND OTHER PRISONERS PERSONALLY WITNESSED ("CAUGHT") TWO LAW LIBRARY LTA AS MOSES, AND MS_____, ILLEGALLY OPENING THE LOCKED LEGAL MAIL BOX (US MAIL BOX) AND STEALING AND THROWING IN THE TRASH PLAINTIFF'S OUT-GOING MAIL TO THE COURTS, THUS CAUSING MISSED DEADLINES AND CASE DISMISSALS — THOSE CASES LATER BECAME HIS 3-STRIKES CASES;

(i) REPEATEDLY THROWING PLAINTIFF IN THE HOLE WHILE HE BEHAVES AS A MODEL PRISONER, WITHOUT ANY LEGITIMATE CAUSE, TO SEPARATE HIM FOR MONTHS FROM HIS ACTIVE COURT CASES AND LEGAL ACTIVITIES, SAD OTHERWISE THESE 3-STRIKES CASES (LATER BECAME SUCH); AND ALSO "CHILLING" PLAINTIFF PSYCHOLOGICALLY AND EMOTIONALLY FROM BEING CAPABLE OF PROSECUTING HIS SUITS AND INFLICTING HIM WITH "LAS" ("LEGAL ABUSE SYNDROME") WHICH, IN TURN, INSUPERABLY RESTRAINED HIM FROM THE CAPABILITY TO PROSECUTE HIS COURT SUITS;

(j) BARRED PLAINTIFF FROM HIS EARNED AND MANDATORY-PROVIDE PHONE CALLS, TO PREVENT AND SABOTAGE THE LEGAL ASSISTANCE PLAINTIFF HAD ESTABLISHED BEFORE FILING HIS SUITS, AND RELIED ON BEING ABLE TO USE THIS AVENUE, ITS CONSTANT DENIAL, CONTRIBUTED MUCH TO INABILITY TO PROSECUTE HIS SUITS;

(k) DEFENDANTS CONSTANTLY (SCARES OF TIMES) SET UP PLAINTIFF WITH VIOLENT, VINDIC-TIVE, EVIL CELLMATES WHO CONSTANTLY TERRORIZED HIM, ROBBED HIS PROPERTY, CUT THE WIRES IN HIS TYPEWRITERS, & OTHERWISE BROKE THEM INTENTIONALLY, STOLE & DESTROYED HIS LEGAL FILES, INVADED AND SECRETLY GOT HOLD OF PLAINTIFF'S PERSONAL AND FAMILY ADD-RESSES AND PHONE NUMBERS AND ATTEMPTED TO EXTORT PLAINTIFF'S FAMILY (WOMAN) WITH

THREATS OF VIOLENCE AND DEATH TO PLAINTIFF, COMPLAINTS OF THIS TO CACH STAFF LED TO

THEM THREATENING PLAINTIFF WITH MAJOR REPRISALS IF HE DIDN'T STOP PURSUING THESE COMPLAINTS

FOR A REMEDY;

(L) STAFF STARVING AND DEHYDRATING PLAINTIFF WITH TOTAL NEAR-FATAL CACHEXIA,

INCLUDING 13 SEPARATE TIMES WHERE IT WAS DOUBTFUL HIS BODY COULD SURVIVE AND WAS

AT THE BRINK OF DEATH, EACH TIME TAKING SOME 6 MONTHS TO RECOVER SUFFICIENTLY TO

NORMALLY FUNCTION INCLUDING ADEQUATELY DO LEGAL WORK;

(m) ASSAULANT GUARDS STEALING AND DESTROYING 29 OF PLAINTIFF'S APPROVED

TYPEWRITERS TO STOP HIS LEGAL WORK AND DESTROY BY SABOTAGE ALL OF HIS COURT CASES—

WHICH SUCCEEDED, IT ALSO "CHILLS" PLAINTIFF FROM BEING PSYCHOLOGICALLY/EMOTION-

ALLY CAPABLE OF PROSECUTING HIS SUITS; AND TO THIS THEFT OF SOME 7 TV SETS, SOME

9 RADIOS, TAPE PLAYERS, CD PLAYERS/MUSIC DECKS, 6 OR 7 NEW PAIR OF EXPENSIVE

TENNIS SHOES, ABOUT 6 HOT POTS, ABOUT 6 FANS, 3 EXPENSIVE ELECTRIC SHAVERS,

MANY HUNDREDS OF DOLLARS OF CLOTHES (NEW MOSTLY), HUNDREDS OR THOUSANDS OF DOLLARS

OF COSMETICS AND SUCH —— ALL PAID FOR BY PLAINTIFF'S FAMILY/FRIENDS AND OBTAINED

BY EARNING AND APPROVAL, STOLEN BY GUARDS AS VINDICTIVE REPRISALS FOR PLAINTIFF'S

LITIGATING RETALIATION—AND "CHILLING" HIS LITIGATION ABILITIES AND CAUSING DEEP

DEPRESSION, SUICIDALNESS, AND LAS,

(n) STEALING AND DESTROYING MEGA-MILLIONS OF DOLLARS WORTH OF PLAINTIFF'S UNRELEASABLE

MUSIC COMPOSITIONS AND SONGS, INCLUDING HIT SONGS, AND BILLIONS OF DOLLARS OF HIS WRIT-

TINGS' VALUE, THAT HE CAN NEVER CONCEIVE AGAIN— IN RETALIATION FOR LITIGATING AND

PURPOSES TO "CHILL" AND CAUSE WITHDRAWING AND INABILITY TO PROSECUTE THE SUITS—

WHICH WORKED! IT CAUSES EXACTLY THAT.

(o) PHYSICAL VIOLENCE FROM GUARDS AND MEDICAL STAFF AS LITIGATOR RETALIATION TO

"CHILL" PLAINTIFF OUT OF FURTHER PROSECUTION OF HIS SUITS— WHICH RETALIATION SUCCEEDED;

(p) CONSTANTLY FOR 30+ YEARS, IN CONTINUUM, GUARDS STEALING ALL OF PLAINTIFF'S

INK PENS TO SABOTAGE HIS COURT DEADLINES, WHILE FOR 33 YEARS REFUSING TO SUPPLY

INK PENS TO PLAINTIFF WHO WAS INDIGENT FOR SAME 29 YEARS, WHEN CDC/R REGULATIONS

1  MANDATE DEFENDANTS TO SUPPLY PLAINTIFF WITH WRITING PWS (TITLE 15 CCR § 3138(a))

2  (9) DEFENDANTS DENYING AND PREVENTING EARNED VISITS AND FAMILY VISITS (CONJU-

3  GAL), [struck] INCLUDING GENOCIDE OF PLAINTIFF'S FAMILY LINE, AND AGGRESSIVELY

4  DESTROYING HIS MARRIAGE (2 DIFFERENT ONES 16 YEARS APART) AS LITIGATOR RETALIATION

5  TO "CHILL" PLAINTIFF'S CAPABILITY TO PROSECUTE HIS SUITS AND RESTRAIN HIM FROM

6  COMPLETING HIS COURT ACTIONS BY LAS, ....

7       AND THIS LIST COULD GO ON INTO MORE THAN 70 MORE CATEGORIES AND

8  OVER 20,000 SPECIFIC EPISODES OF SUCH STAFF ACTIONS, HERE'S THE SIGNIFICANCE:

9  16. PLAINTIFF HAS NEVER FILED A LEGAL ACTION THAT WASN'T A VALID, LEGITIMATE,

10  NON-FRIVOLOUS, VEXATIOUS NOR OTHERWISE IMPROPER CASE THAT BECAME A 3-STRIKES

11  CASE AND HE COULD PROVE THAT EASILY. THE CASES THAT BECAME 3-STRIKES CASES

12  DID SO SOLELY BECAUSE THESE "IMPEDIMENTS" OF CAPABILITY BY DEFENDANTS' AGENTS

13  PREVENTED PLAINTIFF FROM COMPLETING, SUPPORTING WITH EVIDENCE, AMENDING ACTIONS, AND

14  APPEALING HIS ACTIONS THAT WOULD HAVE RESULTED IN NO CASE BEING DISMISSED ON

15  ANY 3-STRIKES GROUNDS (OR FOR ANY OTHER BASIS) HAD PLAINTIFF'S REASONABLY FREE

16  ABILITY TO CONTINUE TO PROSECUTE HIS CASES NOT BEEN TOTALLY SABOTAGED TO THE

17  POINT IT WAS HUMANLY IMPOSSIBLE TO COMPLETE, AMEND, APPEAL, SUPPLEMENT, THEM

18  UNDER THESE CONDITIONS OF DELIBERATE, GROSSED-UP SABOTAGE OF THEM AND DESTRUCTION

19  OF PLAINTIFF'S LIFE AND [struck] FAMILY AND SEED LINE AS REPRISALS FOR HIS ATTEMPTING

20  TO PROSECUTE THEM AND AS A RESTRAINT TO BEING CAPABLE OF FURTHER PROSECUTION OF THEM

21  17. PLAINTIFF ASSERTS THAT THIS SET OF CIRCUMSTANCES CONSTITUTES FRAUD, POSITIVE

22  FRAUD OR, ALTERNATIVELY CONSTRUCTIVE FRAUD, WHICH FALLS WITHIN THAT LEGAL CATEGORY

23  OF FRAUD WHICH NULLIFIES JUDGMENTS BASED ON IT FROM INCEPTION. PLAINTIFF REQUESTS

24  THE COURT TO SO RULE AND RE-SITUATE THE CASE STATUS, DECLARE AND NULLIFY THE

25  3-STRIKES CASES AND PLAINTIFF'S STATUS ACCORDINGLY, AND PREFERABLY TO FIRST CON-

26  DUCT A FULL EVIDENTIARY HEARING TO FULLY EXPOSE AND PROVE ALL OF THESE CLAIMS.

27

28

18. (B) PLAINTIFFS' 3-STRIKES STATUS IS AT ODDS WITH THE INTENTS AND PURPOSES OF THE PROCEDURAL BARS/PROHIBITIONS OF § 1915(G)

IT IS WELL ESTABLISHED IN LAW, BEYOND CONTROVERSY, THAT THE INTENT OF A STATUTE IS THE HEART AND SPIRIT OF THE LAW AND THE BASIS ON WHICH LAW IN AMERICAN JURISPRUDENCE IS TO BE APPLIED. IT IS EQUALLY WELL-ESTABLISHED THAT THE INTENT AND PURPOSE OF THE 3-STRIKES LAW WAS TO RESTRAIN ABUSERS OF THE LEGAL SYSTEM IN PRISONS, NOT TO SET A TRAP TO CATCH PREY IN WHO WERE NOT ABUSING THE PRISON LEGAL SYSTEM BUT COULD BE CANVASED INTO THAT "TRAP" BY CRIMES, FRAUD, MISCONDUCT BY PRISON AGENTS AS IS THE CASE HERE. THE STATUTORY LAW OF §§ 1915 NEVER INTENDED THE LATTER. AS PLAINTIFF IS NOT OF THE LATTER CATEGORY, BUT WAS A LEGITIMATE, NON-ABUSIVE LITIGATOR WHO WAS CANVELED INTO THIS FRAUDULENT TRAP BY PRISON AGENTS VIOLATING DOZENS OF LAWS TO PRESS PLAINTIFF INTO THIS ILLEGITIMATE "TRAP" WHICH FLIES IN THE FACE OF THE STATUTE'S INTENT AND PURPOSE, THE COURT SHOULD, AS A MATTER OF FUNDAMENTAL FAIRNESS AND FOR THE SAKE OF ADHERING TO THE LEGAL MAXIM ~~THAT~~ AND CARDINAL OVERARCHING RULE OF LAW THAT "JUSTICE BE DONE", NULLIFY PLAINTIFFS' 3-STRIKES STATUS OR AT LEAST ALLOW THIS CASE TO PROCEED.

19. (c) PLAINTIFF DID NOT WILLFULLY ENGAGE WHATSOEVER IN ANY COURT ACTION ACTIVITIES. HIS COURT ACTIONS (ALL), INCLUDING ALL THAT BECAME 3-STRIKES CASES, WERE ACTS DEFENDANTS FORCED PLAINTIFF TO FILE AND BE ENGAGED IN WHATSOEVER, AGAINST HIS WILL TO SAVE HIS LIFE AND ESTABLISH HIS SAFETY AGAINST CRIMINAL ACTS BY DEFENDANTS (DEFENDANTS' AGENTS).

AS EXPLAINED IN THE PREVIOUS SEVERAL PAGES, ESPECIALLY BEGINNING ON P 8 ¶ 13, PLAINTIFF HATES, LOATHES ANY KIND OF LAW WORK & LITIGATURE - IT IS AGAINST HIS

nature, it vexes his spirit and destroys him internally. He engaged in lawsuit
filing (that resulted in 3-strikes status) only by being forced to against his
will by defendants' many activities to wreck his life, destroy him, drive him
to suicide, set him up with brutal, potentially violent attacks by unwanted
cellmates, and even direct attempts by CDCR employees (defendants' agents)
to murder plaintiff outright. (See one example, among others, Exhibit C,
Declarations of 3 out of over 60 eyewitnesses observing Sgt. S. Lemon trying
to murder plaintiff with a door at CDC prison). Accordingly, plaintiff
should not be penalized for being forced against his will into this position as a
set up by defendants (agents) to fraudulently manufacture a "3-strikes" case
accordingly the court should, and is requested to, reverse/nullify the 3-
strikes status and/or, in any event allow this case to proceed without pre-
payment of fees.

20.   (E) As applied to plaintiff (not speaking generally), the
      1915 (g) statute is unconstitutional, or unconstitutionally
      applied in this case
      Plaintiff does not challenge § 1915 (g) as unconstitutional generally; that
challenge has probably been raised many times and foreclosed emphatically by all
involved courts.

21. However as applied specifically to plaintiff, and specifically to the instant
case, plaintiff challenges this application as unconstitutional. Plaintiff's claim is based
on the following:

22. The 1915 (g) statute has been deemed to be constitutional solely because those
to whom it is applied (a) brought about its application to them solely by their own misconduct
of abusing the legal system and (b) because they still have an avenue of some alter-
native means to access the courts (i.e. by payment of the fees. In the instant case, both of

15

THESE FACTORS ARE NON EXISTENT,  (a) PLAINTIFF HAS SHOWN ABOVE HOW, ONE, FRAUD ACTS BY

DEFENDANTS *MAY* CAUSED THE 3-STRIKES AS A MANUFACTURED (CRIMINALLY MANUFACTURED) ACT OF

FRAUD THAT IF IT WAS HUMANLY IMPOSSIBLE TO OVERCOME W/PLAINTIFF'S POSITION; AND THAT HE DID

NOT COMMIT ANY "ABUSIVE" ACT, AS SHOWN IN THIS NEW REVELATION; AND (b) THAT DEFENDANTS,

AGAIN BY CRIMINAL ACTS FORCED PLAINTIFF INTO THIS POSITION OF HAVING EVER LIFTED A PEN IN

THE FIRST PLACE TO EVER FILE A SUIT, AND WOULDN'T HAVE EVER DONE SO IF NOT NEEDED FOR

HIS SAFETY AND EVEN TO SAVE HIS LIFE. ~~ABOVE TO (a)~~

23. SECONDLY, IT WILL BE SHOWN BELOW, THAT, AND HOW, PLAINTIFF WOULD BE ABLE TO

PAY THE FULL FILING FEE, AND WOULD GLADLY DO SO, EXCEPT ONCE AGAIN IT IS DEFENDANTS' ILLEGAL

AND ARGUABLY CRIMINAL ACTIONS THAT RESTRAIN AND PREVENT PLAINTIFF'S ACCESS TO HIS BILLIONS

OF DOLLARS, NOT LIQUID DUE TO DEFENDANTS' ACTIONS, BUT STUCK LOCKED IN HIS INTELLECTUAL PROPERTY,

BOTH THAT WHICH CURRENTLY EXISTS, AND THOSE DESTROYED BY DEFENDANTS' AGENTS WHICH PLAINTIFF

MUST BE COMPENSATED FOR.

24. SO NOT ONLY DOES PLAINTIFF (a) PRESENT FACTUAL EVIDENCE AND HAS LINED UP THE WORLD'S

#1 TOP EXPERTS FOR TRIAL (AND/OR EVIDENTIARY HEARING) WHO CAN/WILL PRESENT IRREFUTABLE

SCIENTIFIC EVIDENCE THAT EVERY SINGLE DAY IN PRISON HIS "BODY" IN BEING SO SEVERELY "INJURED" AS TO

CAUSE HIS PREMATURE DEATH BY AT LEAST 20 YEARS LIFE REDUCTION ALREADY (THE "IMMINENT" AND OCCUR-

RING "PHYSICAL INJURIES" INFLICTED RIGHT NOW UNAVOIDABLY ARE CAUSING HIS ACTUAL DEATH WHICH WOULD

NOT OTHERWISE BE OCCURRING UNTIL AT LEAST 20-30+ YEARS LATER), AND THAT BY TORTUROUSLY-PAINFUL

DISEASE INFLICTION, AND IT IS IRREVERSIBLE, IRREPARABLE, (HE SUFFERS MOUTH BLISTERS AND BODY BOILS EVERY

FEW DAYS PRESENTLY FROM MCS/TOXICITY REACTIONS); AND (b) PRESENT EVIDENCE-BACKED LEGAL

ARGUMENTS AND FACTS THERETO THAT DEMONSTRATE HIS 3-STRIKES STATUS WAS PLANNED, ENGI-

NEERED, MANUFACTURED AND SUSTAINED BY ACTS OF POSITIVE FRAUD BY DEFENDANTS' AGENTS TO

DELIBERATELY SABOTAGE HIS ACCESS TO THE COURTS BARRING ANY REMEDY FOR HIS SOUGHT REDRESS OF

GRIEVANCES, REMEDIES TO INHUMANE, TORMENT CONDITIONS AND HIS F/ACTUAL INNOCENCE FOR WHICH HE IS

WRONGFULLY AND UNCONSTITUTIONALLY IN PRISON AND WAS FORCED AGAINST HIS WILL TO FILE ALL OF HIS

3-STRIKES LAWSUITS TO SAVE HIS LIFE AND LIMB BY BRUTAL HOMICIDE IN PRISON, BUT NOW ALSO

HE (c) PRESENTS A FACTUAL CLAIM THAT HE COULD AND WOULD GLADLY PAY THE $400 FILING FEE IF NOT

FOR FURTHER ILLEGAL, UNCONSTITUTIONAL, FRAUDULENT AND CRIMINAL ACTS BY DEFENDANTS' AGENTS,

PART III

ILLEGAL FORCED INDIGENCE

25.  PLAINTIFF WOULD BE ABLE TO PAY THE $400 FILING FEE AND WOULD READILY AND GLADLY DO SO IF DEFENDANTS' AGENTS DIDN'T RESTRAIN AND PREVENT HIM FROM DOING SO.  THE CIRCUM-STANCES ARE THESE:

26.  PLAINTIFF IS PRESENTLY KEPT IN A STATE OF TOTAL INDIGENCE SOLELY BY DEFENDANTS' ACTS OF CRIMINALITY AND MISCONDUCT.  PLAINTIFF HAS A NET WORTH VALUE IN THE BILLIONS OF DOLLARS, BUT ALL OF IT IS LOCKED WITHIN HIS INTELLECTUAL PROPERTY, PRIMARILY OF ORIGINAL MUSIC COMPOSITIONS, SONGS INCLUDING MAJOR HIT SONGS, (VALUED IN THE MILLIONS OF DOLLARS OF SILVER), AND INVENTIONS AND INNOVATIONS (SOME VALUED IN THE BILLIONS OF DOLLARS, OTHERS MEGA-MILLIONS.  DEFENDANTS' POSITION IN REGARD TO THIS MONEY IS (a) THAT THEY PREVENT PLAINTIFF FROM LIQUIDATING THE PROPERTY INTO A FORM OF MONEY AND OTHER TANGIBLE VALUES; AND (b) DEFENDANTS' AGENTS HAVE STOLEN, DESTROYED AND OTHERWISE TAKEN AND DEPRIVED PLAINTIFF (AND THE WORLD) OF PLAINTIFFS' INTELLECTUAL PROPERTY, OTHER MATERIAL PROPERTY, AND OPPORTUNITIES FOR GENERATION OF BILLIONS OF DOLLARS (OF SILVER) MORE, FOR WHICH THEY OWE PLAINTIFF BILLIONS OF DOLLARS FOR HIS FOREVER-GONE INVENTIONS, INNOVATIONS, AND MUSIC/SONGS; (c) THE THEFT OF PLAINTIFFS' TIME, HIS LIFE, AND ALL THAT EN-COMPASSES AND ENTAILS BY HIS ILLEGAL AND UNLAWFUL CAPTIVITY STATUS, GENERALLY, AND SECONDARILY THE TAKING OF PLAINTIFFS' TIME (THE MINUTES AND HOURS THAT CONSTITUTE HIS LIFE) BY THE DEMANDS ON PLAINTIFFS' TIME AND THE ROBBING OF HIS TIME AS THE DAYS AND HOURS PASS WITHIN CACR, TIME HE COULD AND WOULD INSTEAD USE FOR HIS LIFEWORK AND FULFILLMENT OF HIS CALLING, IF NOT FOR BEING TAKEN BY DEFENDANTS' AGENTS.  (EXAMPLES OF THIS WOULD INCLUDE MAKING PLAINTIFF TOTALLY WASTE THE IRREPLACEABLE DROPS OF LIFE WAITING IN LINES AND PERFORMING SOME MUNDANE BUT UNAVOIDABLE CACR OBLI-GATION, WHEN HE WOULD OTHERWISE BE USING THAT SAME TIME TO COMPLETE WRITING HIT SONGS OR WRITING OUT INVENTIONS OR INNOVATIVE PLANS OF VARIOUS SORTS, WHICH GENERATE LARGE SUMS OF MONEY, MILLIONS AND BILLIONS OF DOLLARS), IF NOT FOR CACR/DEFENDANTS' INCESSANT INFRINGEMENTS ON PLAINTIFFS' TIME.

27.  IN MORE SPECIFIC DETAIL, DEFENDANTS' AGENTS HAVE COMMITTED THE FOLLOWING CONSTITUTIONAL AND FELONY VIOLATIONS AGAINST PLAINTIFF WHICH SOLELY ARE THE REASON PLAINTIFF IS PRESENTLY IN A STATUS

17

OF INDIGENCE RESTRAINED BY DEFENDANTS FROM ACCESSING HIS RATHER EXTREME MONETARY WEALTH

1  FROM WHICH HE COULD AND WOULD BE ABLE TO PAY THE FULL FILING FEE — ABLE THOUSANDS OF TIMES

2  OVER, AND HE WILLINGLY WOULD.  BUT FOR:

3     (a) DEFENDANTS' AGENTS ON HUNDREDS OF OCCASIONS ~~BEFORE~~ HAVE OUTRIGHT FELONIOUSLY STOLEN

4  THOUSANDS OF DOLLARS (WORTH OF PLAINTIFFS' PERSONAL APPROVED PROPERTY), WHICH HE'S HAD TO REPLACE

5  COUNTLESS TIMES; HE WOULD BE MANY THOUSANDS OF DOLLARS AHEAD OF WHERE HE IS NOW, IF NOT

6  FOR THIS. (THOUSANDS OF THESE ACTS WERE DOCUMENTED WITH EXQUISITE ACCURACY AND DETAIL, ALL RUN

7  THROUGH A COMMERCIAL PAPER SHREDDER BY SGT M. JONES ON OR ABOUT 3-15-2011 AT KVSP

8  FOR THE EXPRESS PURPOSE OF SABOTAGING PLAINTIFFS' COURT CASES, SUCH AS AND INCLUDING THE INSTANT

9  ONE.

10    (b) DEFENDANTS' AGENTS HAVE ON MANY OCCASIONS FELONIOUSLY AND UNCONSTITUTIONALLY STOLEN

11  (CUMULATIVELY) THOUSANDS OF PLAINTIFFS' ORIGINAL MUSIC AND SONGS INCLUDING HIT SONGS WORTH

12  AND VALUED AT AT LEAST 20 MILLION DOLLARS EACH, AND PRICELESS FOR PROPERTY, AND SIMILARLY

13  STOLEN PLAINTIFFS' INVENTIONS AND INNOVATIVE IDEAS AND BUSINESS PLANS VALUED AT BILLIONS OF

14  DOLLARS MARKET VALUE — AND THE WAY THESE INSPIRED SUBCONSCIOUS CREATIONS AND DISCOVERIES COME

15  TO PLAINTIFF IN A SPIRITUAL MODE AND REALM, ONCE GONE WITH OUT PRESERVATION IN SOME TANGIBLE,

16  MATERIAL FORM (WRITTEN, VOCALLY RECORDED, ETC), PLAINTIFF HAS NEVER BEEN ABLE TO CONCEIVE THEM

17  AGAIN; LOST FOREVER.

18    (c) DEFENDANTS' AGENTS HAVE HELD PLAINTIFF IN ILLEGAL CAPTIVITY (FALSE IMPRISONMENT AND

19  KIDNAPPED STATUS) FOR MANY YEARS, AND IN DOING SO HAVE DEPRIVED HIM OF MEGA-MILLION DOLLAR

20  OPPORTUNITIES SUCH AS APPEARING ON SHARK TANK WITH HIS INVENTIONS AND BUSINESS PLANS, COMPETING

21  ON THE VOICE AND BEING AMERICA'S FIRST AMERICAN NINJA WARRIOR, MARKETING MANY OF HIS 250 -

22  350 INVENTIONS, PRODUCING TV SHOWS HE'S CREATED, BEING ESTABLISHED AS ONE OF THE MOST

23  MAJOR MUSIC STARS AND TV/FILM ACTORS OF THIS GENERATION — — ALL OF WHICH PLAINTIFF WAS

24  ACHIEVING WHEN TAKEN FROM SOCIETY AND REASONABLY WOULD HAVE IF NOT FOR DEFENDANTS UNCON-

25  STITUTIONAL AND ILLEGAL CAPTIVITY OF HIS PERSON. PLAINTIFFS' WEALTH FROM THESE STOLEN OPPORTUNI-

26  TIES WOULD HAVE PAID THE COURTS' $400 FEE MANY THOUSANDS OF TIMES OVER.

27    (d) ON A DAILY BASIS DEFENDANTS PLACE DEMANDS ON PLAINTIFFS' TIME BY COURT OBLIGATIONS AND

28

REQUIRED INVOLVEMENTS/ACTIVITIES THAT CONSTITUTE HUNDREDS OF DEMANDS EVERY DAY.

1   UNABLE TO MEET ONLY ABOUT 20-22 HOURS PER DAY SLEEPING OFTEN ONLY 1½-2 HOURS

2   NIGHTLY DUE TO THESE DEMANDS. THIS ROBS PLAINTIFF OF IMMEASURABLE MONETARY

3   WEALTH HE WOULD BE GENERATING BUT FOR THESE MOSTLY WAVE AND SENSELESS OBLIGATIONS,

4   28. WHEREFORE, DEFENDANTS (AGENTS) DAILY ROB PLAINTIFF, ILLEGALLY, UNCONSTITU-

5   TIONALLY OF MASSIVE MONETARY WEALTH, AND PREVENT HIM FROM ACCESS TO HIS EXISTING

6   WEALTH THATS KEPT LOCKED UP IN THE FORM OF INTANGIBLE INTELLECTUAL PROPERTY HE COULD AND

7   WOULD READILY MAKE TANGIBLE AND LIQUID IF NOT FOR DEFENDANTS' RESTRAINTS ——FROM WHICH

8   HE COULD AND WOULD PAY THE FILING FEES. A REASONABLE AND FINE ACTION BY THIS COURT

9   IN THIS CASE WOULD BE FOR THE COURT TO ORDER AND CAUSE THIS LOCKED AWAY INTANGIBLE

10   WEALTH TO BE MADE TANGIBLE AND ACCESSIBLE TO PLAINTIFF.

11

12

13   III

14   LEGAL ABUSE SYNDROME (LAS)

15   PLAINTIFF SUFFERED FROM THIS CONDITION DURING HIS 3-STRIKES

16   CASES PERIOD, WHICH PREVENTED HIM AS SURE AS PHYSICAL SHACKLES FROM

17   SAVING HIS COURT ACTIONS FROM ERRONEOUSLY FALLING UNDER 3-STRIKES

18   CLASSIFICATION

19

20   29. "LEGAL ABUSE SYNDROME" (LAS) IS THE NAME COINED BY A CLINICAL PSYCHOLO-

21   GIST OR _____, FOR A CONDITION NOW RECOGNIZED AS AN ACTUAL PSYCHO-

22   LOGICAL DISABILITY BY THE AMERICANS WITH DISABILITY ACT (ADA) FEDERAL STATUTES.

23   THIS CONDITION, NOT A "MENTAL ILLNESS," IS A PSYCHOLOGICAL BREAKDOWN CAUSED BY INJUST/

24   UNFAIR DISASTROUS CONDITIONS SUFFERED BY WRONGS INFLICTED BY JUDGES AND OTHER PLAYERS IN

25   THE SYSTEM IN COURT CASES IN THE JUDICIAL SYSTEM. AS RELEVANT TO THE INSTANT CASE,

26   LAS INVOLVES A PSYCHOLOGICAL BARRIER SIMILAR TO THE PATHOLOGICAL REACTION OF A

27   TRAUMATIC RAPE VICTIM WHO CAN'T PUSH THROUGH THE MENTAL BARRIER TO BE INVOLVED IN

28

SEXUAL MATTERS OR FACING THE PERPETRATOR OF THE RAPE TRAUMA. LAS IS SIMILARLY TRAUMA-

TIC IN ERECTING AN INSUPERABLE BARRIER TO FURTHER INVOLVEMENT WITH THE JUDICIAL SYSTEM

AND ITS EMOTIONAL RAPE- LIKE EFFECTS ON THE TRAUMATIZED VICTIM. THIS BARRIER, THOUGH

PSYCHOLOGICAL AND EMOTIONAL, ~~FEET~~ RESTRAINS THE VICTIM EVERY BIT AS CONSUMMATELY AND

WITH INSUPERABLE POWER EVERY BIT AS MUCH AS PHYSICAL SHACKLES RESTRAIN PHYSICALLY.

30. AT ALL TIMES INVOLVING PLAINTIFF'S 3-STRIKES CASES, AND ALL HIS COURT

CASES FROM THE 1980s THROUGH THE PRESENT, PLAINTIFF HAS SUFFERED FROM AN EXTREME CASE

OF LAS SO PRONOUNCED THAT IT WAS HUMANLY IMPOSSIBLE FOR HIM TO PROCEED ON HIS

CASES, TO AMEND, APPEAL, AND OTHERWISE BE EVEN MINIMALLY ADEQUATE IN CAPACITY TO

PROSECUTE ANY OF THESE CASES. SO IN ADDITION TO ALL ELSE, PLAINTIFF WAS RESTRAINED

BY LAS, AS POWERFUL AS PHYSICAL SHACKLE RESTRAINTS, FROM SAVING HIS CASES FROM WRONGFUL

3-STRIKES CLASSIFICATION. IT WAS HUMANLY IMPOSSIBLE; AND THUS PLAINTIFF WAS INCAPABLE

OF AVOIDING AN ERRONEOUS 3-STRIKES ASSIGNMENT TO HIM AND HIS CASES.

IV

AN EVIDENTIARY HEARING IS REQUESTED

FOR GOOD CAUSE

31. PLAINTIFF REQUESTS AN EVIDENTIARY HEARING TO BE CONDUCTED BY THE COURT WITH

PLAINTIFF AND ASSISTING COUNSEL PERSONALLY PRESENT. UNLESS THE COURT CAN GRANT PLAINTIFF'S

REQUESTED RELIEF IN THIS CASE WITHOUT AN EVIDENTIARY HEARING, A HEARING IS NECESSARY TO GET

TO THE BOTTOM OF NUMEROUS ASPECTS OF FACTS AND HOW THE LAW APPLIES TO THEM TO DETERMINE

THE 3-STRIKES STATUS ONE WAY OR THE OTHER. A SAMPLING OF WHAT THAT INCLUDES IS AS

FOLLOWS:

(2) EXPERT AND OTHER TESTIMONY AND PRESENTATION OF SCIENTIFIC-BASED EVIDENCE OF PHYSICAL

INJURY PLAINTIFF SUFFERS FROM TOXINS, NUTRITIONAL DEPLETION) GMOs, FLUORIDE, CHLORINE, HALOGENS ETC.

(b) EXPERT AND OTHER EVIDENCE FLESHING OUT OF FACTS CONCERNING PLAINTIFF'S MCS/CHEMICAL

HYPERSENSITIVITY IN GENERAL AND AS TO PLAINTIFFS' BODY INDIVIDUALLY, WITH DR. KUHN PRESENT;

(c) PLAINTIFFS' STATUS OF BEING LIKE A MAGNET THAT SPIRITUALLY DRAWS HOMICIDAL, BRUTAL VIOLENCE, RAGE ATTACKS, DEMONIC ATTACKS, HATE, AND EVIL FROM EVIL, DEMONIC-WHIPSITED CELLMATES/FELONS WHO ARE DEMONIC AND THE OPPOSITE SPIRITUAL POLE OF PLAINTIFF; HOW THIS KEEPS PLAINTIFF IN A STATE OF IMMINENT PHYSICAL INJURY, PERPETUALLY UNTIL SUCH CELLING ARRANGEMENTS ARE BROKEN UP;

(d) PLAINTIFFS' HISTORY OF BEING FORMOST TARGETED BY SOME 1500 CAGE GUARDS TO BE RELENTLESSLY TERRORIZED AND HIS LEGAL FILES AT CRITICAL TIMES VIS-A-VIS HIS COURT CASES CONFISCATED AND DESTROYED, AND AT OTHER TIMES, PURLOINED FOR YEARS WITH LITTLE OR NO ACCESS TO THEM UNTIL THIS BARRED ACCESS RESULTED IN THE CASE(S) BEING SMOTHERED BEYOND ANY HOPE OF REPAIR OR REVIVING THE DAMAGES.

(e) EXPERT TESTIMONY AND PRESENTATION OF CLINICAL DATA CONCERNING LAS, IN GENERAL, AND SPECIFICALLY AS APPLIED TO PLAINTIFF, AND DETERMINE ITS RESTRAINT POWER IN THIS CASE, OF RESTRAINING PLAINTIFF UNTIL HE WAS INCAPABLE OF ACTING IN ANY WAY TO SAVE HIS STATUS AND CASES FROM 3-STRIKES CLASSIFICATION,

(f) THE DEGREE TO WHICH PLAINTIFFS' 3-STRIKES STATUS WAS SYSTEMATICALLY PLANNED, MANUFACTURED, AND CARRIED OUT IN A CRIMINAL CONSPIRACY, AND TO WHAT DEGREE SUCH ACTIVITIES CONSTITUTE FRAUD OF SUFFICIENT MAGNITUDE AS TO WARRANT REVERSAL OF THE PRESENT 3-STRIKES STATUS, OR DECLARING IT NULL AND VOID FROM INCEPTION DUE TO THE FRAUD.

(g) PRESENTATION OF EVIDENCE OF PLAINTIFFS' HYPERSENSITIVE CONDITION AND ITS UNAVOIDABLE CAUSATION OF INVOKING CELLMATE RAGE AND VIOLENCE AT THE PERPETUAL LEVEL OF "IMMINENT PHYSICAL INJURY," INCLUDING EXPERT TESTIMONY AND CLINICAL DATA PRESENTATIONS;

(h) TO GET TO THE BOTTOM OF THE MATTER OF PLAINTIFF BEING COERCED AND FORCED BEYOND HIS WILL TO EVER ENGAGE IN ANY LAWSUITS OF ANY SORTS, AND HOW DEFENDANTS' AGENTS DELIBERATELY FORCED PLAINTIFF AGAINST HIS WILL TO FILE ANY (AND ALL) OF HIS 3-STRIKES COURT CASES, OR ANY COURT CASES, IN ANY COURT,

(i) AND ALL OTHER RELEVANT INFORMATION HELPFUL TO A JUST DETERMINATION IN THIS MATTER.

# V

## RELIEF

WHEREFORE, PLAINTIFF REQUESTS THE COURT RECONSIDER ITS FEES AND BASED ON THE INFORMATION IN THIS OBJECTIONS PLEADINGS, TO COME TO A CONTRARY CONCLUSION, AND EITHER (a) CONDUCT A FULL EVIDENTIARY FOR THE REASONS PRESENTED, OR OTHER REASONS OF USEFULNESS, OR (b) DECLARE THE 3-STRIKES STATUS BASED ON FRAUD AND DECLARE THE STATUS A NULLITY FROM INCEPTION, OR (c) OTHERWISE GRANT PLAINTIFF HIS REQUEST TO BE PERMITTED TO PROCEED ON THE MERITS OF PROSECUTION OF THIS SUIT

RESPECTFULLY PRESENTED,

Free Lazar, PLAINTIFF

## VERIFICATION

AS TO ALL FACTS STATED IN THIS PLEADING, FIRST BEING DULY SWORN, I AFFIRM, SUBJECT TO PENALTIES FOR PERJURY THAT THE FACTS ARE ALL TRUE ACCORDING TO MY PERSONAL KNOWLEDGE. THIS AFFIDAVIT OF VERIFICATION MADE THIS 14th DAY OF JULY 2016, IN THE COUNTY OF MONTEREY, CALIFORNIA.

DATED: 7-14-16

Free Lazar
Affiant/Plaintiff                    ORIGINAL

# EXHIBITS

# EXHIBIT A

**RICHARD A. KUNIN, M.D.**
**3637 Sacramento Street #C**
**San Francisco, CA 94115**
**TEL 415 346-2500**

19 May 2013

California State Prison
Desk of BPH
PO Box 8800
Corcoran, CA 93212                    Re: Mr. P. F. (Free) Lazor C-73842

I was physician to Mr. Lazor in 1979, before the shooting that took the life of Mr. John Allred. He was a gentleman, highly intelligent and ambitious and he paid his bill even while in a low-income situation. The shooting was provoked by the fact that Mr. Allred kicked down the locked door to Lazor's room while yelling death threats. This was witnessed by Joan Harper, who was on the phone with Mr. Lazor at the time and she acted on his request to call the police.

Most people who hear this story are alarmed that Mr. Lazor was convicted of 2nd degree murder when he was, himself, victim of home invasion by Mr. Allred. All are even more puzzled to learn that Mr. Lazor remains imprisoned 30 years later! "Why is he still in prison?" they ask. I am frankly discouraged myself that this judicial atrocity has gone on so long.

Mr. Lazor was a college student, leader of a popular musical group which performed regularly, and was working on his first real estate deal at the time of the assault by Mr. Allred, which led to the shooting. If it is in error that he still believes that his conviction and incarceration are undeserved and excessive, he has lots of company. I shared his story with **Mr. Kevin Mullen**, former assistant chief of San Francisco Police, and he read the entire 2000 page trial transcript, pro bono, and gave two opinions: 1)" I'd have shot him myself;" 2) "Lazor is tenacious."

But the predominant factor in Mr. Lazor's conviction is that the Coroner, Angelo Ozoa, testified that Mr. Allred was shot in the back! It is clear to me that Mr.Lazor's conviction hinged on the Dr. Ozoa's testimony, based on autopsy bullet hole evidence of entry and exit wounds. Would the District Attorney have pressed for murder in the first degree without such support? Would the defense attorney have agreed, as he did, with prosecution claims that Mr. Lazor had done wrong?' Would Judge Wright have instructed the jury to NOT consider self-defense in their deliberation? **Would the jury have settled on a verdict of Murder in the Second degree if they knew that the Coroner, Angelo Ozoa, would later be delicensed and fired from his job due to incompetence and falsification.** Had the jury known that the Coroner was unreliable, would they have been willing to convict Mr. Lazor of murder when the **ONLY DIRECT WITNESS, Joan Harper, supported the defense!?**

Another question: why would hearings before the Board of Prison Terms reach the conclusion that Mr. Lazor is "unusually well qualified for parole" but then refuse parole and require him to remain for years more in prison? Is his prolonged stay in prison based on CDC-RVR 115 infractions, issued by guards, then why have a Parole Board Hearing at all? My research indicates that the intent of the State Law is to prevent such a cruel and inhuman outcome, where years of good behavior are disallowed because of minor and non-violent infractions.

I believe that Mr. Lazor has serious medical problems and that these have caused misunderstanding and mistrust of him by multiple prison staff members over the years. One of his diagnoses is chemical sensitivity, which is a highly individual condition, environmentally linked but subjective in its symptoms. Because it has been medically controversial until recently, this malady was often interpreted as of mental or psychiatric origin. This has certainly affected his credibility and made his adaptation in prison all the more difficult—even up to the present time, when the medical world recognizes antioxidant and

1

glutathione deficiency and psycho-immune conditioning as real life factors, along with genetic susceptibility, in such patients.

Please keep in mind that Mr. Lazor consulted me for similar symptoms in 1979, two years before his conviction and incarceration.  Bottom line: the symptoms of chemical sensitivity are real and not feigned. 'Feigned,' is the word Warden Martel used a few years ago to describe the staff opinion of Mr. Lazor's behavior. However, there has been no secondary gain for Lazor; only punishment and alienation from many of his fellow inmates and staff—and ultimately mistrust of his character. Directly or indirectly, this has surely been a factor in his repeated failure to win the confidence of the Parole Board!

Chemical sensitivity was a new and controversial medical concept 30 years ago and Mr. Lazor's early request for non-fluoridated water worked against him right from the very first. It seems there was total skepticism by the medical staff at that time. However there has been much progress in medical biochemistry, even in this controversial area of public health. **Fluoride** is now well-known to cause stomach and bowel irritation, bone and muscle pain, kidney damage, skin eruptions, and mental depression and torpor, even at remarkably low doses . And it affects people on an individual basis, some more than others. All of these symptoms are made worse in the presence of high levels of **arsenic,** which was (and still is) present in the water at Kern Valley Prison.

His attempts to avoid these and other triggers while in prison have been difficult to explain and for staff to understand. Mr. Lazor's early awareness of chemical sensitivity came during his adolescent years in Michigan, where he was exposed to the toxin: PBB (polybrominated biphenyl). This chemical poison remains in the human body for decades after exposure!
The point is that over the time of his incarceration, advances in medical science do lend credibility to Mr. Lazor's health concerns in prison. Newly available laboratory testing could reveal the specific factors that cause his symptoms; but my main point, is that his ongoing symptoms are similar to those that prompted him to consult me so many years ago, when he was working his way through college and attempting to get a start in the real estate business and make something of himself. He is not feigning symptoms; but he has been 'tenacious.' And this certainly has complicated his status in the California State Prison System.

**Finally, from the perspective of his family and friends:** 1) He has served his time beyond the requirements of his sentence; 2) His life history contains no prior criminal record; 3) He poses no danger to anyone; 4) His medical symptoms are evidently misunderstood in prison and have provoked RVR 115 reports that evidently have repeatedly blocked his parole.  5) His friends, all law-abiding and respected citizens, support his release and are ready to assist him in his return to civilian life. 6) It will be much more difficult for him to adjust to re-entry if we all die off before
he is released.  7) I pray that you will agree that it is time now to grant parole to this deserving man.

Thank you for your service.

Sincerely yours,

*RICHARD A. KUNIN, M.D.*

Richard A. Kunin, M.D. California Medical License C-20214
P.S. While my board certification is in psychiatry (1962), my private practice career has been dedicated to preventive medicine for the past 45 years and with emphasis on medical issues. I served for two years as a Captain in the United States Army Medical Corps, then staff psychiatrist at Minneapolis Veterans Administration Hospital, and neurophysiology research Fellow at Stanford University Medical School. In 2006 I was appointed to the San Francisco Mayor's Council on Homelessness.

CC: Gayle Travis and PF Lazor, gaylet78@yahoo.com
CC: Law office of Diane LaTarte, FAX 619 233 3689

Email: dietarte@earthlink.com

2

## "Profile on Dr. Richard Kunin"
### Internet / On Line

**BOARD MEMBER INTROSPECTIVE:  RICHARD KUNIN, M.D.**
### by Scott Tips

We have heard it before, maybe even hundreds of times.  I know I have.  It is Ralph Waldo Emerson's quote where he counsels, "Do not go where the path may lead, go instead where there is no path and leave a trail."  So I hesitate to even mention it here, it seems almost trite with so many quoting Emerson yet so few real trailblazers out there -- except for one thing that I have learned, NHF Board of Governors member Richard Kunin, M.D. is an authentic trailblazer who merits the name.

**A Trailblazer Par Excellence**

Some of us count ourselves lucky if we are first in anything at all, but Dr. Kunin's list of firsts is anything but paltry.  In 1964, Time Magazine featured him in its article "Head to Toe Hypnosis," as having the first neurophysiology approach to medical hypnosis, a basis for a more-scientific method of psychotherapy.  In 1969, he originated "The Mental Tune-Up," a therapy based on linguistics and mood-training hypnosis.  In 1972, Prevention Magazine wrote about Dr. Kunin in "He Cures Psychiatric Disorders with Nutrition," as the first person to combine computer diet, vitamin and mineral testing, and hypnotherapy -- a prototype of holistic medicine.  So, long before the word holistic was in use, Dr. Kunin had integrated hypnosis, behavior therapy, and orthomolecular medicine and psychiatry into a comprehensive model of general medical practice.  Research into mineral metabolism led to his 1974 discovery that manganese treatment is successful in treating drug-induced tardive dyskinesia.  This demonstration of a mineral therapy came at a time when most medical authorities were united against nutrition therapy.

In 1975, Dr. Kunin was the first person to discover that aspirin blocks the skin-flush response to niacin (Vitamin B3) flush and to suggest that the anti-schizophrenic action of niacin is related to prostaglandins.  In 1976, he was the first to introduce an individualized diet method based upon mood and energy effects, the Ortho-carbohydrate Diet.  This led him that same year to co-found the Orthomolecular Medical Society, of which he was also president from 1979 to 1981.

Publication of his best-selling book Mega-Nutrition in 1980 launched the Listen to Your Body Diet, ™ a method of balancing dietary carbohydrate, fat, and protein according to one's individual needs.  Both Mega-Nutrition and his other best-seller, Mega-Nutrition for Women (1983), helped to define the role of orthomolecular nutrition in general medical practice.

In 1987, Dr. Kunin developed the first cure for autism due to Thalassemia Minor, which is a genetic disease dramatically helped by nutrition therapy.  See President's Commission on Mental Retardation and Mental Illness (Washington, D.C., 1988).  In 1988, he followed this

up by being the first to identify the effect of DMAE on MAO, linking induced MAO to treatment benefits.

Then, in 1990, he achieved the first measurement of EPA (a long-chain omega-3 oil) in snake oil, substantiating its anti-inflammatory benefits from the anti-leukotriene B4 action of EPA. This was actually an historic first since it showed that snake oil is not quackery after all!

But the list of firsts continues. In 1993, Dr. Kunin was the first Interim President of the International Society for Orthomolecular Medicine (Toronto). The next year, he was the first to identify carnitine deficiency with myasthenia as being due to valproic acid and aspirin; and, while catching his breath, decided to found the Society for Orthomolecular-Health Medicine (OHM), a medical-education society and a memorial to Linus Pauling. These two organizations have paved the way for medical practice to begin to accept nutriceuticals on a par with pharmaceuticals. We are still at an early stage in this medical evolution however.

In 1996, Dr. Kunin was the first to measure fluoride in hair and to demonstrate hair levels of up to 20 parts per million in an out-patient population, providing further evidence of a major public-health problem. Three years later, in 1999, he was the first to develop and publicize the theory that linked autism to ischemia and apoptotic neurological damage triggered by nutrient deficiency, toxicity, and vaccine activation of coagulation. In 2000, he was among the first to treat pro-coagulant factors in general medical patients and identify those combinations that predispose individuals to degenerative disease.

In 2001, he was the first to propose that megavitamins work as anti-coagulants, not just as antioxidants with anti-inflammatory effects. That same year, Dr. Kunin was among the first to identify vitamin-K deficiency syndrome, including osteoporosis, periodontal disease, inflammatory bowel disease, pancreatic disease, carpal tunnel, osteoarthritis, temporal-mandibular joint (TMJ) disease, and as a common factor in delayed healing.

Most recently, in 2003, Dr. Kunin was the first to identify the most important epidemic of our time: the genetic epidemic. Alarmingly, he discovered the mutation rate in 150 consecutive patients to be unexpectedly high: MTHFR (folate reductase) over 90% mutated and Methionine synthase (MTR and MTRR) over 95% mutated!

With this amazing track record of his, we fully expect to see more firsts in the future coming from this star member of our Board who was just re-elected to a new term. Dr. Kunin truly exemplifies the Renaissance man.

## With an Unusually Broad Background

Educated at the University of Minnesota, Dr. Kunin received his M.D. degree in 1955. Following psychiatric residency training at New York Hospital, Payne Whitney Clinic, which he completed in 1959, he served for two years in the United States Army Medical Corps with the 7th Division at the DMZ and the 121 Evac Hospital in Korea, and later at Valley Forge Army Hospital in Pennsylvania.

Awarded an NIH post-doctoral fellowship in neurophysiology at Stanford University Medical Center in 1962, Dr. Kunin's depth-electrode studies documented hippocampal

2

theta rhythm changes in "animal hypnosis." Application of this research to human hypnosis led to his appointment as a consultant in behavior therapy at Stanford in the Department of Psychology. He was also appointed "lecturer in hypnosis" at the University of California Medical Center in San Francisco. In 1970, he was elected president of the San Francisco Academy of Hypnosis (a professional education society).

In 1986, Dr. Kunin began a 12-year stint as a columnist for the San Francisco New Fillmore. His column, "Putting Nutrition First," was a big hit with its readers that gave them valid health information they could use.

All of this activity and achievement has taken place against a backdrop of life in San Francisco, California with his wife Matilda for the last 43 years. Of two sons, one survives and runs a thriving business. The other unfortunately died in a freak accident at a young age. This motivated Matilda, an amazingly productive and beautiful person, to establish the San Francisco Young Performers Theatre in his memory. To this day, it remains an important part of San Francisco arts with eight main stage plays and 120 performances annually. Matilda has also established a Theatre in Education project, funded by the Haas Foundation, which brings theatre and performance experience to pre-school and early primary school children. Her productive energy well complements that of Dr. Kunin.

## And a Renaissance Medical Practice

Dr. Kunin practices a health-medicine strategy that puts nutrition and detoxification first in medical diagnosis and therapy, along with exercise and endocrine support for adaptive mechanisms that can cope with disease. These health-medicine factors open the door to life-long self-therapy, which is only possible with ongoing health education and reinforcement of personal habits, including diet and specific nutrient supplementation. Equally helpful is the quest for healing thoughts, beliefs, and practices, which are central to every true "health-oriented therapy."

Megadose vitamin therapies generate some controversy even now, but it is widely accepted that they are powerful antioxidants. For example, Vitamin C, Vitamin E, Vitamin B6, B12, folic acid, and many bioflavonoids -- all are directly or indirectly antioxidant. Of equal importance, they are anticoagulants as well. In fact, megavitamins hold a key to blood flow; and blood flow is the key to cellular nutrition. Reduced blood flow can cause free radicals, inflammation, and cell death by apoptosis within four hours. Thus, ischemia can induce cells to self-destruct by apoptosis. This mechanism is painless and non-inflammatory but it can magnify tissue damage, aggravate illnesses, and accelerate the aging process.

Megavitamin therapies are also an answer to biochemical individuality, a term popularized by Dr. Roger Williams forty years ago. These days, with the advent of DNA testing, it has become evident that genetic mutation is far more common than previously thought. As mentioned previously, the frequency of mutations that he has found in his primary-care practice is more than 90 percent in genes that regulate the folic-acid enzyme, MTHFR, and the B12 enzyme, MTR. The response to treatment with megadoses of folic acid and methylcobalamin B12 has been most gratifying, quite literally bringing us a new frontier in medical history.

## Public Advocacy

3

Active in several non-profit organizations, Dr. Kunin leaves no stones unturned. The Society for Orthomolecular Health Medicine, of which Dr. Kunin is an active member in addition to the NHF, is dedicated to providing educational programs for health professionals and the public about the scientific roots of health-medicine. It advocates a strategy of diagnosis and treatment that addresses genetic and nutrient factors to identify the personal needs of the individual patient and that then provides support for the adaptive mechanisms and for resistant symptoms that persist despite orthomolecular therapy. As Dr. Kunin has long said, "Science has given us the tools to provide better diagnosis of the physiological and biochemical needs of our individual patients and, thus, to restore nutrition and environmental factors to the center of medical thinking. Without such a strategy, it is likely that the advances of 'alternative' medicine will be suppressed and under-utilized for years to come."

That is another reason why Dr. Kunin says that the NHF's mission of health freedom is so very important. Among other things, accomplishing this mission helps to spread the word that the orthomolecular movement remains dedicated to the message of Linus Pauling: "The right molecules in the right amounts." And it thereby helps bring together the consciousness of health professionals and all of humanity in support of natural healing, healing by physiological and "orthomolecular" methods.

4

# EXHIBIT B

# Hyperacusis

From Wikipedia, the free encyclopedia

**Hyperacusis** (also spelled **hyperacousis**) is a health condition characterized by an increased sensitivity to certain frequency and volume ranges of sound (a collapsed tolerance to usual environmental sound). A person with severe hyperacusis has difficulty tolerating everyday sounds, some of which may seem unpleasantly or painfully loud to that person but not to others.[1][2]

It can be acquired as a result of damage sustained to the hearing apparatus, or inner ear. There is speculation that the efferent portion of the auditory nerve (olivocochlear bundle) has been affected (efferent meaning fibers that originate in the brain which serve to regulate hearing). This theory suggests that the efferent fibers of the auditory nerve are selectively damaged, while the hair cells that allow the hearing of pure tones in an audiometric evaluation remain intact. In cases not involving aural trauma to the inner ear, hyperacusis can also be acquired as a result of damage to the brain or the neurological system. In these cases, hyperacusis can be defined as a cerebral processing problem specific to how the brain perceives sound. In rare cases, hyperacusis may be caused by a vestibular disorder. This type of hyperacusis, called vestibular hyperacusis, is caused by the brain perceiving certain sounds as motion input as well as auditory input.

| Hyperacusis | |
|---|---|
| **Classification and external resources** | |
| **Specialty** | otolaryngology |
| **ICD-10** | H93.2 (http://apps.who.int/classificatio ns/icd10/browse/2016/en#/H93.2) |
| **ICD-9-CM** | 388.42 (http://www.icd9data.com/getI CD9Code.ashx?icd9=388.42) |
| **DiseasesDB** | 29099 (http://www.diseasesdatabase.co m/ddb29099.htm) |
| **MeSH** | D01200178 (https://www.nlm.nih.gov/ cgi/mesh/2016/MB_cgi?field=uid&ter m=D01200178) |

Although severe hyperacusis is rare, a lesser form of hyperacusis affects musicians, making it difficult for them to play in the very loud environment of a rock band or orchestra which previously gave them no problems. It also makes attendance at loud discos or live events difficult for a portion of the population, given that sound levels at such events usually exceed recommended safe levels of exposure. This is a problem which may be caused by genetic differences, stress or ill-health, or by abnormal responses in the tensor tympani and stapedius muscles, which function in the normal acoustic reflex response that protects the inner ear from loud sounds.[3]

40% of people with tinnitus report mild hyperacusis.

## Contents

- 1 Signs and symptoms
- 2 Causes
- 3 Treatment
- 4 Notable cases
- 5 See also
- 6 References
- 7 External links
- 8 Further reading

# Signs and symptoms

3

In cochlear hyperacusis (the most common form of hyperacusis), the symptoms are ear pain, annoyance, and general intolerance to any sounds that most people don't notice or consider unpleasant. Crying spells or panic attacks may result from cochlear hyperacusis. As many as 86% of people with hyperacusis also have tinnitus.[2][4]

In vestibular hyperacusis, the person may experience feelings of dizziness, nausea, or a loss of balance when sounds of certain pitches are present. For instance, people with vestibular hyperacusis may feel like they are falling and as a result involuntarily grimace and clutch for something to brace themselves with. The degree to which a person is affected depends not only on the overall severity of that person's symptoms but also on whether the person can detect sounds in that frequency range at the volume in question, as well as on the person's preexisting muscle tone and severity of startle response.

Anxiety, stress, and/or phonophobia may be present in both types of hyperacusis. Someone with either form of hyperacusis may develop avoidant behavior in order to try to avoid a stressful sound situation or to avoid embarrassing themselves in a social situation that might involve noise.

A person with hyperacusis might be startled by very low sound levels. Everyday sounds like shutting doors, ringing phones, television, running water, ticking clocks, chewing gum, cooking, normal conversation, eating, dishes, and other sounds will cause varying levels of annoyance and can potentially pain the ears.

# Causes

The most common cause of hyperacusis is overexposure to excessively high decibel levels (or sound pressure levels).[5] Some come down with hyperacusis suddenly by firing a gun, having an airbag deploy in their car, experiencing any extremely loud sound, taking ear sensitizing drugs, Lyme disease, Ménière's disease, TMD/TMJ (Temporomandibular joint disorder), head injury, or surgery. Others are born with sound sensitivity, develop Superior Canal Dehiscence Syndrome, have had a history of ear infections, or come from a family that has had hearing problems. The Diagnostic and Statistical Manual of Mental Disorders (DSM) that is published by the American Psychiatric Association lists hyperacusis as one of the possible signs indicating phencyclidine (PCP or Angel-dust) intoxication.

Causes include, but are not limited to:

- Adverse drug reaction
- Autism Spectrum
- Bell's palsy[1]
- Chronic ear infections
- Chronic fatigue syndrome
- Depression[1][2]
- Developmental coordination disorder
- Ear irrigation
- Facial nerve dysfunction (to stapedius)[1]
- Fibromyalgia
- Head injury
- Lyme disease[1]
- MAO inhibitor discontinuation syndrome
- Migraine[1][2]

- Ménière's disease
- Multiple Sclerosis
- Noise-induced hearing loss
- Posttraumatic stress disorder[1]
- Sensory Processing Disorder
- Severe head trauma[1]
- Superior canal dehiscence syndrome (SCDS)
- Surgery
- Systemic lupus erythematosus (SLE) [6]
- Tay–Sachs disease
- Temporomandibular joint disorder (TMJ)* A vestibular disorder: see below.
- Tension myositis syndrome
- Tinnitus
- Williams syndrome[1][7]

# Treatment

Case 2:16-cv-00461-TLN-CKD   Document 11   Filed 07/20/16   Page 35 of 65

The most common treatment for hyperacusis is retraining therapy which uses broadband noise. Tinnitus retraining therapy, a treatment originally used to treat tinnitus, uses broadband noise to treat hyperacusis. Pink noise can also be used to treat hyperacusis. By listening to broadband noise at soft levels for a disciplined period of time each day, patients can rebuild (i.e., re-establish) their tolerances to sound. When seeking treatment, it is important that the physician determine the patient's Loudness Discomfort Levels (LDL) so that hearing tests (brainstem auditory evoke response). If people have access to medical care, steroids are used to treat hyperacusis within 72 hours of the onset of the condition.

# Notable cases

- Ludwig van Beethoven suffered from hyperacusis, alongside tinnitus and hearing loss.[8]
- Musician Jason DiEmilio of Azusa Plane suffered from hyperacusis. His story was told in BuzzFeed.[9]
- Musician Stephin Merritt suffers from monaural hyperacusis in his left ear, which influences the instrumentation of his band, The Magnetic Fields, and leads him to place his hand on the affected ear during audience applause.[10]
- Chess legend Bobby Fischer is said to have had hyperacusis, and he needed total silence in order to concentrate on his games.
- Franz Kafka suffered from hyperacusis and insomnia.[11]
- American politician, LGBT activist, and film producer Michael Huffington has mild hyperacusis and underwent sound therapy after finding that running tap water caused ear pain.[12]

# See also

- Misophonia
- Hearing loss
- Sensory processing disorder
- Tinnitus
- Tinnitus masker

# References

1. Baguley DM (December 2003). "Hyperacusis". *J R Soc Med* **96** (12): 582–5. doi:10.1258/jrsm.96.12.582. PMC 539655. PMID 14645606.
2. Andersson G, Jüris L, Kaldo V, Baguley DM, Larsen HC, Ekselius L (2005). "[Hyperacusis--an unexplored field. Cognitive behavior therapy can relieve problems in auditory intolerance, a condition with many questions]". *Lakartidningen* (in Swedish) **102** (44): 3210–2. PMID 16329450.
3. Westcott M (December 2006). "Acoustic shock injury (ASI)". *Acta Otolaryngol Suppl* (556): 54–8. doi:10.1080/03655230600895531. PMID 17114144.
4. Nelson JJ, Chen K (July 2004). "The relationship of tinnitus, hyperacusis, and hearing loss". *Ear Nose Throat J* **83** (7): 472–6. PMID 15372918.
5. Størmer CC, Stenklev NC (March 2007). "[Rock music and hearing disorders]". *Tidsskr. Nor. Laegeforen.* (in Norwegian) **127** (7): 874–7. PMID 17435808.
6. Batuecas-Caletrío, A.; Pino-Montes, J. del; Cordero-Civantos, C.; Calle-Cabanillas, M. I.; Lopez-Escamez, J. A. (2013-04-01). "Hearing and vestibular disorders in patients with systemic lupus erythematosus". *Lupus* **22** (5): 437–442. doi:10.1177/0961203313477223. ISSN 0961-2033. PMID 23423252.
7. Zarchi O, Attias J, Gothelf D (2010). "Auditory and visual processing in Williams syndrome". *Isr J Psychiatry Relat Sci* **47** (2): 125–31. PMID 20733255.
8. "Molecular Interventions - CLOCKSS". Molinterv.aspetjournals.org. Retrieved 2012-10-29.
9. http://www.buzzfeed.com/joycecohen/noise-kills-when-everyday-sound-becomes-torture
10. "The Magnetic Fields in Concert". *Creators at Carnegie*. National Public Radio. 2005-05-31. Retrieved 2005-08-27.
11. "Sshh! There's a genius at work: Being overly sensitive to sound could be the key to intellectuals' creativity". dailymail.co.uk. 9 March 2015. Retrieved 7 August 2015.

5

# When Everyday Noise Is Unbearable

By

*Joyce Cohen*

December 1, 2014 4:49 pm

December 1, 2014 4:49 pm

27



Credit George Rue

Like many people, George Rue loved music.

He played guitar in a band. He attended concerts often.

In his late 20s, he started feeling a dull ache in his ears after musical events.

After a blues concert almost nine years ago, "I left with terrible ear pain and ringing, and my life changed forever," said Mr. Rue, 45, of Waterford, Conn.

He perceived all but the mildest sounds as not just loud, but painful. It hurt to hear.

Now, he has constant, burning pain in his ears, along with ringing, or tinnitus, so loud it's "like a laser beam cutting a sheet of steel." Everyday noise, like a humming refrigerator, adds a feeling of "needles shooting into my ears," said Mr. Rue, who avoids social situations and was interviewed by email because talking by phone causes pain.

23

Mr. Rue was given a diagnosis of hyperacusis, a nonspecific term that has assorted definitions, including "sound sensitivity," "decreased sound tolerance," and "a loudness tolerance problem."

But hyperacusis sometimes comes with ear pain, too, a poorly understood medical condition that is beginning to receive more serious attention.

"This is clearly an emerging field," said Richard Salvi of the Department of Communicative Disorders and Sciences at the University at Buffalo and a scientific adviser to <u>Hyperacusis Research</u>, a nonprofit group that funds research on the condition. "Further work is required to understand the symptoms, etiology and underlying neural mechanisms."

Loud noises, even when they aren't painful, can damage both the sensory cells and sensory nerve fibers of the inner ear over time, causing hearing impairment, said M. Charles Liberman, a professor of otology at Harvard Medical School, who heads a hearing research lab at the Massachusetts Eye and Ear Infirmary. And for some people who are susceptible, possibly because of some combination of genes that gives them "tender" ears, noise sets in motion "an anomalous response," he said.

Photo



Credit Jonathon Rosen

The prevalence of hyperacusis, with or without pain, is unknown. Some studies suggest that 8 percent of people have an "unusual intolerance of ordinary environmental sounds," while 2 percent have "troublesome hyperacusis."

Hyperacusis with pain is a "fundamentally different physiological entity" than mere increased sensitivity, Dr. Liberman said. The auditory nerve contains myelinated fibers, which are used to perceive loudness and to process speech, as well as unmyelinated ones. Though it has not been proven, hyperactivity in these unmyelinated fibers may be responsible for the increased pain sensation in affected individuals, he said.

Pain could also stem from pain receptors on the eardrum or from the tiny middle-ear muscles or joints, Dr. Salvi said.

activities. I should take it slow, perhaps a year or more, they warned me, gradually increasing the volume, and eventually my tolerance might start to improve—but because it was already so low, they added, it was unlikely that it would ever return to normal levels.

Then I asked the question I'd been steeling myself to ask since I arrived: What about music?

The answer that came back was crushing and hopeful at the same time. I would never be an orchestral musician again, they said—but while the retraining program couldn't guarantee success, it was possible that in time, I might improve enough to someday play the cello.

This time, I became a perfect, zealous patient.

* * *

Months later, I was able to tolerate moderate levels of sound. With my hearing devices in, my husband and I could once again go to quiet romantic films, dine in restaurants if we avoided the weekend crowds, and invite a small group of friends over. But my fingers itched to play. Two years after my trip to the Oregon clinic, gingerly at first and with the left earplug in, I started to play the cello again, but it no longer came as easily as it once had. My muscles ached, my fingers chafed against the slender metal strings. I sounded like a complete beginner. Almost a decade after my trip to Oregon, I can comfortably play with three or four other musicians in a modest-sized room. It's not an orchestra, but it's enough. Life is unthinkable without music.

A recent report in The American Journal of Audiology, funded by Hyperacusis Research along with the Hearing Health Foundation, underscores how little is known about hyperacusis with noise-induced pain, and the confusing and misleading terminology surrounding the condition.

"Words like 'sensitivity' make it seem that sound feels a little louder or stronger," said Bryan Pollard, the president of Hyperacusis Research. But when hearing is actively painful, "pursuing a normal life is impossible. There is no place on earth without sound."

Sufferers can barely sit at a dinner table, where ordinary voices and clanking dishes can cause ear pain that lingers for hours, days or more. The pain is often accompanied by the feeling of pressure known as aural fullness, along with tinnitus.

Three years ago, Ann Lesky, then a math teacher in Newton, Mass., was subjected to a wolf-whistle mere inches from one ear. The pain was excruciating. Within an hour, the ringing started, resembling a whistling teakettle.

Struggling with pain from classroom noise, Ms. Lesky had to leave her job. Pain, which she describes as "a steel rod stabbing and turning in my ear canal," is always present in her bad ear. Tinnitus plagues both ears.

Routine sounds, like the beeping from a store scanner or a vehicle that is backing up, can trigger hours of additional pain. "Louder noises hurt more and last longer," Ms. Lesky, 57, said, "I feel like I am getting better, and then some noise sets me back."

She manages with earplugs, protective earmuffs and noise-canceling headphones. "It is difficult to communicate," she said. "People think I am rude."

Surprise noises are the hardest to deal with, she said. "I am always thinking, what noise will hurt, and how do I avoid it? The quality of my life is almost unbearable. Silence is my only comfort."

Like many patients, Ms. Lesky visited multiple doctors seeking relief. None helped. One ordered a loud M.R.I, which led to months of increased pain and added another permanent tinnitus tone, like breaking glass.

Patients are sometimes prescribed pain drugs or treated with sound therapy, where the volume and duration are increased slowly to help with desensitization.

"Short-term improvement is deceptive," said Mr. Pollard of Hyperacusis Research, who seeks to educate audiologists and ear-nose-throat specialists about "the horrible facts of how a noise injury typically behaves and what a patient really experiences."

"Significant relapses occur with new noise exposure," he said. "We continue to hear from people who follow the bad advice they receive and who go right back out into the world, confused and hurting themselves further."

A version of this article appears in print on 12/02/2014, on page D6 of the NewYork edition with the headline: When Every Sound Is Painful.

29

# Life as a Musician Who Can't Tolerate Sound



It's 2011, and my husband can't kiss me, even on the cheek, because the slightest touch sets off ripples of pain in my head, my face, my jaw. Every noise is an assault—a car alarm goes off, a baby squeals, a group of giggling teens race into the elevator. The ping of an ATM machine. Cicadas chirping. The roar of a leaf blower feels like a knife rotating in my ear. In sympathy, my husband and son tiptoe around me and recoil with each ding. When I must go out, I stuff my ears with custom earplugs and wear Bose noise-cancelling headphones, but they don't help much. It is impossible to predict when noise will bring me to my knees.

I am a professional musician who can't tolerate sound.

\* \* \*

I should have recognized that my career was over that night. It was August 2006, an evening of Broadway favorites, and I was sitting dead center in my spot as principal cello for the Minnesota Orchestra, with the drum set, piano, electric guitars, keyboard, and conductor directly in front of me. Vocalists, three Broadway singers wearing brilliantly colored sequined outfits, pranced across the stage clutching their hand-held microphones, while speakers blasted the music back onto the stage toward us so the singers could hear themselves. During a typical non-classical performance, the stage would hold three of these speakers—but tonight there were eight, one of them no more than two feet from my left ear.

springing back to normal in a few hours, or overnight. But over time, loud sounds can cause more permanent damage as hair cells lose their resilience. Frequent and intense exposure to noise will cause these receptors to flatten down, stiffen, and eventually break. The damage can interfere with the ability to determine the location of a sound, cause extreme sensitivity and pain, and make it impossible to discern language with background noise. One in 20 Americans, or 48 million people, report some degree of hearing impairment.

An alarming statistic, but hearing protection isn't a health habit that's often discussed. The National Institute for Occupational Safety and Health (NIOSH) and the Centers for Disease Control cap the continuous exposure to decibel levels at 85 decibels (dB) for an eight-hour day. Decibels work logarithmically: Permissible exposure times must be halved for each increase of three decibels. Any exposure above 115 decibels, even for a few seconds, is risky. But life is noisy—city traffic can reach 85 dB, restaurant racket exceeds 100 dB. In crowded spaces like a stadium or an orchestra performance space, the sound can hit around 120 dB—and the exposure time and the proximity to the sound exponentially compound the risk of damage.

But still, people willfully jeopardize their hearing every day. Sound exposure is cumulative, creeping up on those who listen to music or cellphone conversations with ear buds for hours at a time or multiple times a day. According to the American Medical Association, one in five teens now suffers from hearing damage and cannot hear whispers, raindrops, or consonants. Noise, not aging, is the leading cause of permanent hearing injury in the U.S.—and even a small amount of hearing loss can have a profound, negative effect on comprehension and social development. Untreated, hearing impairment can affect brain function and is associated with early-onset dementia.

* * *

The doctors didn't know what else to tell me—research about my condition was scarce, and it seemed there was nothing more I could do. But still, my husband researched tenaciously for months, until finally, late one night, he stumbled upon a clinic that specializes in hyperacusis and tinnitus, at the Oregon Health and Sciences University in Portland. It would be three months before they could fit me in.

When the time came to make the trip, I boarded the airplane with the heaviest-duty earplugs I could find. In a tiny examining room at the clinic, my ears convulsed every time they were touched. After two days of 12-hour appointments filled with tests and exams from multiple specialists, the clinic staff fit me with modified hearing aids that I could control with a remote. The specially programmed devices, I was told, would lower the volume of sound without altering its clarity.

The final step was to test them. The doctor banged on a glass dish with a spoon, and I recoiled in anticipation before he even made a sound—but it didn't hurt. We ventured out to the common areas of the hospital, even passing by the noisy cafe. No pain. A woman wearing high-heeled shoes clattered by. Nothing.

With the protection of my new hearing devices, they told me, I could embark on the next phase of treatment—a desensitization strategy to teach my brain to accept sound again. I would need to learn to tune out the noise around me. In other words, I'd need to un-learn my musician's ability to pay close attention to sound. The specialists gave me an armload of CDs of ambient noise—rainfall, wind blowing, ocean waves—that I was to play several hours a day for the next few months, as low-volume background noise to all my normal daily

what if it got worse, to the point where I had to leave music entirely?

In 2009, the worst-case scenario arrived: My right ear, like my left, could no longer tolerate normal activities. The orchestra had scheduled several massive works for the upcoming year, and walking into the orchestra hall for rehearsal without earplugs became intolerable.

After a second months-long round of doctor-hopping, I finally met an ENT who seemed to understand my condition. I had developed a noise-induced ailment called hyperacusis, he told me, an auditory injury caused by repeated exposure to high decibels or a single acoustic shock. It was characterized by abnormal sensitivity—in other words, the total breakdown of tolerance to all sound.

As the doctor ran through his explanation, my first reaction was one of relief. So, I thought, *I'm not going crazy after all*. The severe pain, the dizziness, the fear of sound, all were caused by my brain processing noise as much louder than it actually is.

I had decades of hearing ahead of me, the doctor told me gently, but prolonged exposure would only make things worse. It would be best if I left my job and did something else, something quiet.

Right away, I knew I wouldn't listen. Giving up a 34-year career was unthinkable; playing cello was at the core of my identity. And besides, that summer, the orchestra was set to embark on a three-week tour of Europe's most prestigious concert halls—London, Berlin, Amsterdam, Vienna. I couldn't miss that. Surely I would be able to hang on at least a few more months.

But the programs on the tour included Beethoven's Symphony No. 9, with its famous *Ode to Joy*, which calls for massive forces onstage—a 250-voice chorus, vocal soloists, and more than a hundred orchestra members. I writhed through the concerts; in between, I hid in hotel rooms. The worst pain came during one of the last performances, which took place in London's Royal Albert Hall in front of more than 5,000 audience members. Weeping afterwards in the recesses of the dressing room backstage, I knew I was done.

When we returned to the U.S., I made an appointment with the maestro and the upper management of the Minnesota Orchestra and resigned my position of 31 years as associate-principal cello. Unable to face my colleagues, I left them a note with my goodbyes, returned to my cloistered existence, and promptly sunk into a deep depression.

For months, getting out of bed was a feat of willpower. Taunted by a closet full of elegant black clothing, the uniform of orchestra members, I donated it all to Goodwill. My cello sat unused in its case, a reminder of what I'd lost. My normally animated personality changed as I became subdued and soft-spoken. I spent a lot of time wondering how athletes deal with career-ending injuries, about how they rebuild their lives after being carried off the field for the last time on a stretcher. My own sense of identity crumbled. It was excruciating that what I loved so much could bring me so much pain.

* * *

The ear has 20,000-30,000 hair cells, the nerve endings responsible for carrying the electrical impulses through the auditory nerve to the brain. These delicate receptors bend or flatten as sounds enter the ear, typically

There was no time to move the speaker, the stage manager told me, so I stuffed my ears with musician's earplugs and swallowed my objections that it was too close. I'd be a bit shell-shocked, I assumed, but nothing more than a temporary annoyance.

After an encore from *The Phantom of the Opera*, the program came to a close with thunderous applause. As I exited the stage, I suddenly felt an excruciating sensation in my ears, which radiated down my neck and into my face, neck, tongue, teeth, and jaw. Pain hardly describes it. Meanwhile, the fluttering sensation in my head was making me feel faint.

I hurried out of the building to escape the backstage commotion—every noise, I quickly discovered, was making it worse, including the sound of my own voice—and drove home, barely able to see through my tears. Sleepless, I lay in bed praying the pain would simply subside overnight.

The next morning, I showed up for work, a three-hour dress rehearsal of the opera *Carmen*, pretending all was well. I had spent hours preparing the cello parts for the entire section and perfecting my solos. But the voices of the singers, usually thrilling, was ear piercing. I had to wear earplugs for a classical program for the first time in my long career, too worried that my playing was off to actually focus on the music. I had loved the cello, the instrument whose sound is closest to the human voice, since I began playing at age 16—but now, with the world's volume stuck on high, all I could think about was escaping to silence.

* * *

Over the next few weeks, I saw otolaryngologists and neurologists, heading from one appointment to another in a flurry of anxiety. The ENT exams, neurological assessments, and MRIs revealed no abnormalities—in fact, my hearing tests came back better than normal. I could actually be a spy, I heard so acutely. The specialists recommended psychiatric tests. Perhaps meditation, relaxation exercises, or therapy would help, they told me.

Finally, one of my many doctors offered me a diagnosis: I had sustained an acoustic-shock injury to my left ear. Ear trauma is permanent, with no real treatment. The best I could do was load up on vitamins, abstain from caffeine and alcohol, and keep my life as silent as possible to see if the pain subsided.

I spent the next three months in near-solitary confinement. I avoided social situations. All communication was restricted to email and texts. No TV, no radio, no telephone—and worst of all, no music. Cut off from life outside my home, isolated from human contact and from the thing I loved most, the monotony became nearly intolerable.

The silent exile seemed to help, though. I returned to my position, with a major compromise: I would always have to wear a left earplug, and for the time being I would be excused from performing in any amplified programs. Soon enough, my brain and my life adapted themselves to this new normal. My playing hadn't deteriorated, but as a precaution I kept all noisy activities at bay, even avoiding the car radio. At home, my husband did the vacuuming and the dishes as quietly as possible. My son kept his friends out of the house when I was home. We all stayed away from the television.

But beneath it all ran an undercurrent of worry: What kind of a musician was I now? Would I be able to maintain a high level of playing if I couldn't even hear myself fully because of the earplugs? And most worrying of all,

# Call Center Workers | Hyperacusis Focus

There have been several studies on the development of hyperacusis, tinnitus, and <u>tonic tensor tympani syndrome (TTTS)</u> in call center workers. The development of such symptoms after sudden loud sounds is referred to as *Acoustic Shock Disorder (ASD)*. Studies in ASD do a particularly good job of showing that symptoms of TTTS (e.g. aural fullness and ear pain) can develop after an acoustic injury and it does not always involve the development of hyperacusis.

Studies of the prevalence of acoustic shock in call center employees vary significantly. While some call centers report no incidents of acoustic shock, a study of Indian call center employees found 28% had experienced acoustic shock symptoms at least once during their career (Subbarayalu 2013). Call center employees work in an environment that is particularly demanding on the auditory system. They predominantly use headsets, maintain primary focus on their auditory senses without the help of visual cues, and experience unexpected interruptions by sudden, loud sounds. Below are examples of unexpected sounds these workers are regularly exposed to:

- Incorrectly dialed fax machines.
- Faults on the telephone line that cause loud shrieks
- Maliciously generated noises -- screaming or blowing a whistle down the line.
- Mobile phone interference.
- Callers dropping their handset on to a desktop.

A 2001 study of 104 cases of acoustic shock in Australia found the following symptom prevalence

- Ear Pain (81%)
- Tinnitus (50%)
- Loss of balance (48%)
- Hyperacusis (32%)
- Vertigo and Nausea (15%)
- Headaches (9%)

A description of a scenario of acoustic shock is provided by Patuzzi,

> *"A 'typical' incident may involve the occurrence of one high-intensity, high frequency monaural squawk, without warning (around 2-3kHz, level below 120 dB SPL). The consultant removes the headset in seconds. In extreme cases they 'fall' to the ground immediately, and quickly experience a varied combination of tinnitus, vertigo, feeling of fullness in the ear, hearing loss (in very few cases), numbness, tingling, tenderness or soreness around the ear and neck, ear pain and often burning sensations."* -Patuzzi 2002

Many acoustic shock disorder symptoms are thought to be related to TTTS. More information can be found in <u>Potential Mechanisms: Middle Ear-TTTS</u>.

The audiologist Myriam Westcott has written two detailed papers on <u>acoustic shock disorder</u> and <u>TTTS</u>.

# Earplug Use | Hyperacusis Focus

## Earplug Use

The proper use of hearing protection is not well defined for someone with hyperacusis. If you do not use hearing protection, you run the risk of setbacks or social isolation. If you use hearing protection too often, you run the risk of lowering tolerances further or hindering recovery. Anxiety that often accompanies protection behavior may enhance hyperacusis symptoms as it heightens loudness and pain sensations to a degree. Earplug use is a complex, individual decision that needs to be made with careful consideration of the risks of overprotection. In general, it is more natural for someone with hyperacusis to wear earplugs more often than is necessary which is why emphasis is usually placed on reducing protection.

### Overprotection

The overuse of hearing protection is almost universally discouraged based on evidence that it will lower loudness thresholds over time. Risks of overprotection include increased auditory gain, anxiety induced hypersensitivity, and reinforcement of negative associations with sound. Positive results from studies of <u>Sound Therapy & Counseling</u> reinforce the notion that overprotection can prevent people from building sound tolerance. These treatments emphasize a gradual increase in sound exposure rather than sound isolation. It is often recommended that those with hyperacusis walk the fine line between setbacks and overprotection rather than follow a course of isolation and hypervigilance. Practically applying this guideline is not always straightforward.

Click to Show: Evidence, Severe Hyperacusis, Case Study
*Earplugs and Increased Auditory Gain*
The study most often cited to support the negative impact of long-term earplug use is the 2003 study led by Craig Formby. This study comprised two groups of individuals with normal hearing. One group wore earplugs for two weeks and the other wore noise generators for 2 weeks. The sound tolerance of those who wore earplugs was *reduced* on average by 7 dB. The sound tolerance of those who wore noise generators was *increased* on average by 7 dB. Recovery to original thresholds (a change of 7 dB on average) occurred within 1 week, suggesting that earplugs have a measurable impact on auditory gain. It should be noted that when this experiment was repeated in 2007, there was negligible change in auditory gain after 2 weeks for those who wore earplugs however after 4 weeks there was on average a 6 dB reduction in loudness tolerance. The sample sizes of both studies were unusually small (10 and 8, respectively).

*Assumptions in Application to Hyperacusis*
1. The assumption that sound tolerance will reduce more than 7dB is not strongly supported by these studies. In each study, the average sound tolerance changed by a maximum of 7dB whether it was over 1 week, 2 weeks, or 4 weeks. A similar study (Munro 2014) showed thresholds could be mostly restored within 24 hours of earplug removal suggesting this sort of study is not measuring long term plasticity changes relevant to overprotection concerns or sound therapy treatment. For more robust findings, the study should be repeated with a larger sample size and followed over a longer period of time.

66

2. There is an assumption that the loudness discomfort thresholds of those with normal hearing and those with hyperacusis are determined by a similar mechanism. At the very least, there is an assumption that the discomfort (loudness or pain) is triggered in hyperacusis patients after the enhanced gain. In 2009, Munro and Blount performed a study similar to Formby that showed this gain similarly shifts acoustic reflex thresholds, suggesting that some gain adjustment occurs early in the auditory system. Potential hyperacusis neurological mechanisms and middle ear mechanisms related to acoustic reflex could be impacted by this gain change. A cochlear mechanism might not be impacted by this gain change. A repeat of the study using individuals with hyperacusis split into subtypes (pain and loudness) would address this more directly.

*Challenges with Severe Hyperacusis*

While a person with LDLs in the 80s may have little trouble with most household activities without earplugs, a person with LDLs in the 50s can experience pain by simply turning on a water tap. A more problematic issue arises when unexpected environmental sounds cause setbacks, motivating the severe hyperacusis patient to wear protection when sound levels would on average be pain free. For those with severe hyperacusis, even mild sounds can cause physical pain which can make outsiders view their protection behavior as "overprotection." However, a common theme in most sound therapies is to *not* push through pain. Thus for severe hyperacusis patients, guidelines can be inconsistent. Whatever the hearing protection used, it is generally recommended that a conscious effort be made to *gradually* increase sound exposure, ideally with the help of counseling.

A few studies have attempted to address this dilemma of under- vs over-protection by using electronic devices with loudness compression. A study led by Carol Sammeth of Indiana University School of Medicine used such devices with 14 severe hyperacusis patients with mixed success. Most of the severe hyperacusis patients opted to use the devices only in certain circumstances. Myriam Westcott described the usage of a similar device in 4 of her patients (Westcott 2006). The 3 patients who were able to use the device had hearing loss. The 4th patient without hearing loss "found the proximity of even soft sounds intolerable because they were perceived as right next to the ears." A 2000 study by the Washington University School of Medicine tried a similar method with a 52 year old severe hyperacusis subject. After one year, he still used the devices "all of the time." Practical issues such as hiss from electronic noise, sound while speaking or eating, and uncomfortable amplification of softer sounds would need to be managed. Although these modified hearing aids with compression and sound isolation may work for some, higher quality sound reproduction and additional customization may be necessary in reducing irritation for others. Sound-compressing earmuffs and earplugs are already commercially available for gun use however compression will not start until 85 dB.

*Case Study: Overprotection*

Since hyperacusis can improve slowly, it is important to adjust protection behavior as pain thresholds increase. The full case study of a hyperacusis patient written by Norma Mraz and Robert Folmer can be found on Audiology Online. The individual in the study played guitar and developed hyperacusis at age 33. Over the next 10 years his condition worsened. He went on long term disability and isolated himself in a rural home. To protect from sound, he did not shower, covered the windows with bricks, muted his television, moved the refrigerator outside, and used earmuffs while typing, cooking, and for other common activities. His LDLs were measured to be 55 dB.

He went through a gradual course of TRT. Over the next 27 months, his living conditions improved. He was able rinse a cloth to wash, removed bricks from the windows, started to play the guitar again, and enrolled at a local university. His post-treatment LDLs, however, were not documented. LDL measurements taken before his treatment caused distress so it is possible he chose to not have them taken at the end of treatment. If this was part of a LDL based study (e.g. a TRT study), he may be dropped from the equation for success rates.

**Underprotection**

Increased sound exposure can lead to setbacks. A setback is a sudden drop in sound tolerance as opposed to the gradual reduction in sound tolerance that occurs during overprotection. Setbacks are expected during recovery however they are an under-researched aspect of hyperacusis. Setbacks lasting several days are common. Setbacks lasting weeks, months, or years occur less often but can be deeply discouraging. Anecdotally, it seems setback duration and setback severity reduce to a degree in time. Setback duration and severity also seem to be correlated with hyperacusis severity. While there are over 2200 posts on hyperacusis setbacks in the patient forum on chat-hyperacusis.net, no academic papers could be found using a pubmed search. Some clinicians will inform the patient that sound levels below 85 dB (equivalent to noise from heavy traffic) are safe as they are unlikely to cause long-term hearing loss. While this is comforting and good to know, the relevance to setbacks is unclear as long-term hearing loss (often outer hair cell loss) is not suspected to be related to hyperacusis setbacks. Sound levels that trigger setbacks may be dependent on baseline LDLs and the particular subtype of hyperacusis (pain or loudness). There is a glaring need for research into setbacks to assess the consequences of underprotection. Setback thresholds, duration, severity, and frequency should be studied in relation to long-term recovery. Only then should maximum "safe" sound levels be defined.

Click to Show: Evidence

In the 1999 hyperacusis study led by Mart Anari, 67% of patients reported that their tolerance had worsened after exposure to loud sounds; the duration of the setback was usually between 1-3 days. The 2013 CBT clinical trial led by Linda Juris found that 76% patients reported increased sensitivity after sound exposure. A 2007 TRT study by Formby et al looked at the treatment results of 68 patients after therapy. Although a large percentage of the patients had a positive impact from TRT, 7% of the patients who were willing to go to follow up testing showed a loss in tolerance. This loss was not small, at 10dB on average. This highly suggests setbacks.

In the book *Tinnitus Retraining Therapy* by Jastreboff and Hazell, the authors note that there can be long term consequences when exposing severe hyperacusis patients to sound near their maximum tolerance levels for long periods:

> *"When [severe] patients are exposed to continuous high levels during pink-noise therapy, cumulative effects occur and tinnitus and hyperacusis are set permanently to a much higher level than before treatment began"*

-Tinnitus Retraining Therapy by Jastreboff and Hazell

This is an example of long term setbacks resulting from sound levels likely safe for normal ears. The authors state that sound therapy should instead be set to a low volume and increased very gradually depending on the tolerances of the patient. This example is not meant to discourage gradual sound reintroduction. *Gradual* sound reintroduction is encouraged as results from recent studies suggest it is an effective tool for recovery. Instead, this example is meant to provide evidence for the intuitive assumption that hearing protection and sound

68

environment need to be adjusted according to hyperacusis severity rather than an absolute 85dB value with no proven relevance to hyperacusis. It is clear that further study into setbacks is needed.

**Asymmetrical Protection**

There are cases of hyperacusis that affect one ear more than the other. This quickly leads to the question, "What happens if I only protect my bad ear?" There is limited research on this topic. Studies suggest that auditory gain in the protected ear will increase. If the asymmetrical symptoms are related to a contraction of the acoustic reflex, sound into the unprotected ear can trigger the reflex in the protected ear as well, which would limit the effectiveness of protection. There are similar concerns about asymmetrical protection as there are for general overprotection.

Click to Show: Evidence

Kevin Munro and Jennifer Blount from the University of Manchester performed a study of asymmetrical (monaural) earplug usage over a one week span. They found that the ipsilateral acoustic reflex threshold (reflex caused by sound on same side) of the protected ear decreased on average by 5 dB while the ipsilateral acoustic reflex threshold of the unprotected ear *increased* by 3 dB. There appears to be a balancing effect of the gains, leading to higher sensitivity in the protected ear and lower sensitivity in the unprotected ear. Another study led by Munro involved the asymmetrical usage of hearing aids. In this study, LDLs between the right and left ears deviated by an average of 5 dB after one week with the amplified ear able to tolerate more sound than the unamplfied ear. A longer study would show whether LDLs of the protected ear change at a more rapid rate with monaural earplug usage compared to the binaural earplug Formby experiments.

**References**

Anari M, Axelsson Alf, Eliasson A, Magnusson L. Hypersensitivity to Sound: Questionnaire data, audiometry and classification. *Scand Audiol* 1999:28:219-230.

Formby C, Sherlock L, Gold S. Adaptive plasticity of loudness induced by chronic attenuation and enhancement of the acoustic background. *J. Acoust. Soc. Am.* 2003:114:55-58.

Formby C, Sherlock L, Gold S, Hawley M. Adaptive Recalibration of Chronic Auditory Gain. *Seminars in Hearing* 2007:28(4):295-302.

Formby C, Gold S, Keaser M, Block K, Hawley M. Secondary Benefits from Tinnitus Retraining Therapy: Clinically Significant Increases in Loudness Discomfort Level and Expansion of the Auditory Dynamic Range. *Seminars in Hearing* 2007:28(4):227-260.

Jastreboff P, Hazell J. Tinnitus Retraining Therapy. Cambridge University Press. 2007.

Mraz N, Folmer R. Overprotection-Hyperacusis-Phonophobia & Tinnitus Retraining Therapy: A Case Study *Audiology Online* 2003:http://www.audiologyonline.com/articles/overprotection-hyperacusis-phonophobia-tinnitus-retraining-1105.

Munro K, Walker A, Purdy S. Evidence for adaptive plasticity in elderly monaural hearing aid users. *NeuroReport* 2007:18(12):1237-1240.

69

# Inner Ear | Hyperacusis Focus

## The Cochlea

The function of the inner ear is to convert sound and spatial orientation into nerve impulses to be interpreted by the brain. As a result, dysfunction in the inner ear can result in both hyperacusis and vertigo. This article will focus on dysfunction leading to sound-induced pain and loudness discomfort with less attention on symptoms of vertigo.

The cochlea is the bony, spiraled, fluid-filled structure of the inner ear that is responsible for detecting sound. Specific regions of the cochlea respond most to specific frequencies. The entry point of the spiral is most sensitive to high frequencies and the end of the spiral is most sensitive to low frequencies. As a result, a single frequency tone sent to the ear would only activate a portion of the cochlea as shown in the animation below (refresh page to replay),



From The Cochlea by F. Mammano and R. Nobili

These vibrations are sensed and converted into nerve impulses by hair cells of the organ of corti. Below shows inner hair cells and outer hair cells attached to the basilar membrane. It is the inner hair cells that transmit the vibrations into nerve impulses while the outer hair cells help amplify or dampen vibration.

The video here provides an excellent overview of the cochlea.

More detail on the cochlea can be found by going to www.cochlea.eu/en/cochlea

## Pain Receptors

The cochlea does not contain traditional pain receptors so historically researchers have looked to the brain and middle ear to explain sound-induced pain. Recently, however, studies from Northwestern University and Johns Hopkins have shown pain receptor like behavior from the type II nerves that are connected to the Outer Hair Cells (OHCs). OHCs are the most susceptible to sound-induced damage. Although this is an exciting direction in hyperacusis research, more research is required to prove these nerves are pain receptors that contribute to hyperacusis.

In-Depth: Pain Receptor Details

The suspected pain receptors (nociceptors) are the type II afferent nerves that travel from the OHCs to the brain (in red in the figure above) whose function is currently unknown. These nerves are different from the nerves that travel from the inner hair cells (IHCs) in a few ways. First, a single type II fiber generally connects to

74

an estimated 7 OHCs while 10 type I fibers connect to just a single IHC. In fact only 5% of the nerves connecting to the brain from the cochlea are type II nerves while the remaining 95% are type I nerves from IHCs. Second, these type II nerves have a small diameter and are unmyelinated which makes them poorly suited for rapid transmission of sound information. These nerves more closely resemble nociceptors responsible for slow, aching pain. Third, while nerves from IHCs collectively respond to the full dynamic range of audible sounds levels, type II nerves will not be activated unless the entire pool of OHCs they are connected to are maximally stimulated by only the most intense sound levels. What possible use could these nerves have?

Researchers from Johns Hopkins have been examining these nerves over the last several years. Below are several critical observations made in these studies.

- It requires almost complete excitation of OHCs for the afferent type II neurons to be activated.
- These neurons can be activated by extracellular ATP, a chemical that can produce pain when released by damaged cells including OHCs.
- Mechanical rupture or removal of OHCs causes a robust activation of these neurons. Note that OHCs are much more likely than IHCs to be similarly damaged from sound.

With this information in mind, researchers from Northwestern University performed an experiment to try to activate these neurons through sound. This study confirmed that there is a unique path that is only activated during damaging noise levels (120 dB) but not "innocuous" levels (80dB and below). Granule cells of the cochlear nucleus were found to be the region activated by this signal. It is interesting to note that this is where other sensory information from the head and upper body (spinal trigeminal nucleus and dorsal column) are routed to assist with auditory processing. A signal routed the opposite direction would provide a path from auditory system to pain channels.

*Northwestern Experiment Setup*

There were two groups of mice used to test this theory. One group was a control and the other was genetically unique in that their IHCs were unable to transport the glutamate neurotransmitter and were therefore deaf. The deaf mice and the control mice were found to generate and send the suspected pain signal to the brain even though the deaf mice could not signal sound.

**Holes, Leaks, and Fluid Regulation**

There are disorders known to be caused by changes in inner ear fluid dynamics that can include hyperacusis as a symptom. These include Meniere's disease (irregular endolymph regulation and leaks), endolymphatic hydrops(irregular endolymph regulation), perilymph fistula (leaking perilymph), and superior semicircular canal dehiscence (hole in vestibular canal). Each of these can have telltale symptoms independent of hyperacusis that range from mild to completely debilitating. Such symptoms include

- Vertigo
- Dizziness or imbalance
- Nausea
- Sudden, gradual, or intermittent hearing loss
- Low frequency hearing loss
- Sensitivity to air pressure changes (e.g. flying in an airplane)

- Hearing eye or neck movements
- Involuntary eye movement
- Symptoms worsened by activity, coughing, or sneezing.

It has been proposed that changes in fluid flow can result in conductive hyperacusis. Conductive hyperacusis occurs when the fluid in the cochlea moves more easily than it normally would. This will reduce vibration levels required for hair cell activation, change the resonance of the cochlea, and has potential to confuse the central auditory system. Diplacusis might be expected in those with conductive hyperacusis worse in one ear. Conductive hyperacusis can be a symptom of superior semicircular canal dehiscence. Another suspected cause for conductive hyperacusis is a change in compliance of the round window. See Treatment: Surgery for more information.

More information on these topics can be found using the links below:
Cochlear Fluids I (Cochlea.eu)
Cochlear Fluids II (Washington University Cochlear Fluids Lab)
Endolymphatic Hydrops (Washington University Cochlear Fluids Lab)
Meniere's Disease (Chicago Dizziness and Hearing)
Perilymph Fistula (Chicago Dizziness and Hearing)
Superior Canal Dihiscence (Chicago Dizziness and Hearing)

**Hidden Hearing Loss**
Permanent hearing loss is not a requisite condition for hyperacusis as 40% of those with hyperacusis show normal hearing tests. As described in Potential Mechanisms: Central Auditory System, cochlear damage is a powerful trigger for hyperactivity and gain increases in the central auditory system. Some believe that a normal hearing test implies that the cochlea has not been damaged. This is not necessarily true.

First, common hearing tests only test to 8kHz as these frequencies are the most useful for common activities and speech and are less subject to variation from person to person. However the frequencies from 8 kHz to 20 kHz are the most susceptible to damage and it is common for people even in their 20s to show hearing loss in these regions. Second, it has been shown that hearing tests can still be normal even with the loss of 80% of inner hair cells (IHCs) as long as outer hair cells (OHCs) are still intact. Third, each IHC is connected to roughly 10 nerve fibers that react to different loudness levels. Loss of these fibers would not show up on a hearing test as long as lower loudness level fibers remained intact. Thus cochlear output will have decreased while hearing tests would look normal. All three of these examples of hidden hearing loss are thought to have potential to initiate hyperacusis.

In-Depth: Nerve fiber loss, Hair cell loss
It is worth mentioning that damage to IHCs and IHC nerve fibers are suspected to cause problems with processing speech in noise. However, a survey of 85 hyperacusis patients (Anari 1999) found that speech in noise measures of the group were on average similar to the non-hyperacusis population. Due to the small sample size of the Anari study, a repeat of this test on a larger sample of hyperacusis patients would be valuable.

*Hair Cell Loss*

7b

Inner hair cells (IHCs) are directly responsible for converting sound into nerve impulses. Outer hair cells (OHCs) don't transmit sound to the brain but are critical for mechanically adjusting vibration in the cochlea to amplify quiet sounds and dampen loud sounds. Loss of OHCs reduces vibration and causes hearing loss. OHCs are the most susceptible to damage and the most common cause of noise induced hearing loss. Below is an image of healthy vs damaged outer hair cells.



Healthy vs. Damaged Hair Cells

Although hyperacusis can occur without hearing loss, it is still suspected that permanent hearing loss can trigger hyperacusis.

## Cochlear Amplifier Malfunction

One of the most fascinating features of the cochlea is that it includes mechanical feedback that amplifies vibration and significantly enhances our hearing sensitivity by roughly 50 dB,



This mechanical feedback comes from the OHCs whose hairs (stereocilia) connect to the tectorial membrane and can extend and contract depending on the state of the OHC internal voltage level. The brain can tune these OHCs (via the efferent path) to enhance selectivity and to protect from louder sounds. It is important to note that the efferent control from the brain is not necessary for this amplifier to function. The cochlea itself is tuned in such a way that it naturally provides amplification as long as OHCs are functional.

7.

Some have suggested that a malfunction of OHCs or the efferent path could lead to hyperacusis either from an over-amplification of sounds or an under-protection of sounds. Some researchers find this unlikely for two reasons, First, hyperacusis patients often show normal otoacoustic emissions tests (Jastreboff 2014). Otoacoustic emissions tests measure functionality of OHCs. Second, a study of patients who had surgery to sever their vestibular nerve did not worsen or improve loudness tolerances after the operation (Baguely 2002,2003). The vestibular nerve carries the efferent nerves that control OHCs.

### References

Anari M, Axelsson Alf, Eliasson A, Magnusson L. Hypersensitivity to Sound: Questionnaire data, audiometry and classification. *Scand Audiol* 1999:28:219-230

Baguley DM. Hyperacusis. *J R Soc Med* 2003:96:582-585.

Baguley DM, Axon PR, Winter IM, Moffat DA. The effect of vestibular nerve section upon tinnitus. *Clin Otolaryngol* 2002:27:219-26.

Bharadwaj H, Verhulst S, Shaheen L, Liberman MC, Shinn-Cunningham B. Cochlear Neuropathy and the coding of supra-threshold sound. *Frontiers in Systems Neuroscience* 2014:8(26):1-18.

Chang L, Glowatzki E, Fuchs P. Purinergic Modulation of Type II Cochlear Afferents: Sensing Trauma in the Ear? *ARO Midwinter Meeting Abstract* 2014:37:419-420.

Flores E, Duggan A, Madathany T, Hogan A, Marquez F, Kumar G, Seal R, Edwards R, Liberman MC, Garcia-Anoveros J. A Non-cononical Pathway from Cochlea to Brain Signals Tissue-Damaging Noise. *Current Biology* 2015:25:1-7.

Guinan J, New Insights into Cochlear Amplification. *Biophysical Journal* 2013:105:839-840.

Jastreboff P, Jastreboff M. Treatments for Decreased Sound Tolerance (Hyperacusis and Misphonia). *Seminars in Hearing* 2014:35:105-120.

Knipper M, Dijk P, Nunes I, Ruttiger L, Zimmermann U. Advances in the neurobiology of hearing disorders: Recent developments regarding the basis of tinnitus and hyperacusis. *Progress in Neurobiology* 2013:111:17-33.

Schaette R, McAlpine D. Tinnitus with a Normal Audiogram: Physiological Evidence for Hidden Hearing Loss and Computational Model. *The Journal of Neuroscience* 2011:31(38):13452-13457.

Weisz C, Glowatzki E, Fuchs P. The postsynaptic function of type II cochlear afferents. *Nature* 2009:461:1126-1129

Weisz C, Lehar M, Hiel H, Glowatzki E, Fuchs P. Synaptic Transfer from Outer Hair Cells to Type II Afferent Fibers in the Rat Cochlea. *The Journal of Neuroscience* 2012:32(28):9528-9536.

# Definitions | Hyperacusis Focus

**What is Hyperacusis?**

The lack of consistency in defining hyperacusis is frustrating for researchers and patients alike. The following are the most common definitions for terms related to hyperacusis and decreased sound tolerance.

- **Decreased Sound Tolerance-** Present when every day sounds cause a negative reaction. This includes most of the conditions listed below.
- **Hyperacusis-** Present when every day sounds are perceived as being uncomfortably loud or cause physical pain. Negative reactions to sound caused by something other than uncomfortable loudness or pain (e.g. fear, distortion, tinnitus, annoyance) is *not* defined as hyperacusis. Misuse of the term "hyperacusis" is common.
  - There is a push to replace the often misused "hyperacusis" with "pain hyperacusis" and "loudness hyperacusis" (Tyler 2014). This adds clarity to the meaning of the terms and splits into subtypes where detailed mechanisms will surely have differences. While these two types generally occur together, there is a portion of hyperacusis patients that present loudness hyperacusis without pain and a portion that present pain hyperacusis without increased loudness sensation.
    - **Pain Hyperacusis-** Present when sounds trigger pain in the ear below common pain thresholds (120 dB).
    - **Loudness Hyperacusis-** Present when moderately intense sounds are perceived as being uncomfortably loud.
  - The term *hearing sensitivity* is discouraged as the meaning is ambiguous and it can inaccurately suggests the ability to detect sounds that others cannot hear.

- **Misophonia-** Present when everyday sounds cause a negative *emotional* reaction. Examples of emotions that can be triggered from sound include annoyance, rage and fear. Other researchers wish to drop usage of the term misophonia and instead split this into *fear hyperacusis* and *annoyance hyperacusis* in order to to simplify naming and make the terms easier to interpret by the general public.
- **Phonophobia-** Present when everyday sounds cause fear (subset of misophonia). Other researchers wish to call this *fear hyperacusis* in order to make the term easier to interpret by the general public. For some, this is more directly linked to a fear of re-injury or long-term setback.
- **Vestibular Hyperacusis-** Present when everyday sounds induce disordered balance or vertigo. This is commonly referred to as *Tullio's Phenomenon*.
- **Reactive Tinnitus-** Present when everyday sounds increase tinnitus activity. This is not a term used in research literature but commonly used by tinnitus patients. *Winding-up* and *kindling* are terms sometimes used to describe similar effects.
- **Distortion from Sound-** Present when everyday sounds become distorted. Can cause a negative reaction to loud sounds.
- **Diplacusis-** Generally occurs when one ear has sustained more damage than the other.
  - *Diplacusis Dysharmonica-* Present when a tone is perceived normally in one ear but at a different pitch in

94

the other ear. This is the most common form of diplacusis.

o *Diplacusis Echoica*- Present when the timing of tones is slightly different in each ear. The same sound is repeated as an echo.

o *Diplacusis Binauralis*- Present when same sound is perceived differently in each ear. This may be a change in pitch or timing.

o *Diplacusis Monauralis*- Present when *one* ear hears the same tone as two different sounds.

- **Acoustic Shock-** Acoustic shock is the alteration of auditory function that results from an adverse response to a sudden, unexpected noise event. Tinnitus, hyperacusis, and tonic tensor tympani syndrome (TTTS) are examples of symptoms that can occur as part of acoustic shock.

### What is Loudness Recruitment?

Loudness recruitment is not fundamentally related to decreased sound tolerance or hyperacusis. Loudness recruitment is present when sensorineural hearing loss results in an abnormal growth in loudness perception. With pure recruitment, loudness discomfort levels are normal. Soft sounds are perceived at a reduced intensity while loud sounds are perceived at a *normal* intensity when compared to those with normal hearing. Loudness recruitment can be thought of as an earplug that gradually disappears as sound gets louder. Loudness recruitment leads to the somewhat paradoxical but common request of people to "speak louder" followed by the complaint to "stop shouting" due to the unexpectedly large *change* in loudness.

- Those with recruitment may also develop hyperacusis. Hyperacusis symptoms of those with recruitment are often imprecisely described as recruitment symptoms.
- Recruitment is expected to be a cochlear phenomenon as it is frequency selective and often occurs unilaterally. As described in Potential Mechanisms, there is debate as to whether hyperacusis shares these traits.

### References

Anari M, Axelsson Alf, Eliasson A, Magnusson L. Hypersensitivity to Sound: Questionnaire data, audiometry and classification. *Scand Audiol* 1999:28:219-230

Formby C, Gold S, Keaser M, Block K, Hawley M. Secondary Benefits from Tinnitus Retraining Therapy: Clinically Significant Increases in Loudness Discomfort Level and Expansion of the Auditory Dynamic Range. *Seminars in Hearing* 2007:28(4):227-260.

Jastreboff P, Jastreboff M. Treatments for Decreased Sound Tolerance (Hyperacusis and Misophonia). *Seminars in Hearing* 2014:35(2):105-120.

Joris P. Recruitment of neurons and loudness. *JARO* 2009:10:1-4.

Tyler R, Pienkowski M, et. al. A Review of Hyperacusis and Future Directions: Part I. Definitions and Manifestations. *American Journal of Audiology* 2014:23:402-419.

http://www.healthyhearing.com/report/51055-Understanding-diplacusis

# Symptoms | Hyperacusis Focus

## Symptoms

**Defining Symptom**

- Reduced tolerance of every day sounds as a result of heightened loudness sensations or pain. Reduced tolerance as a result of fear, annoyance, reactive tinnitus, vertigo, or distortion is *not* conventionally defined as hyperacusis.

**Other Symptoms**

- Aural fullness (pressure in ear)
- Tinnitus.
- Sharp, dull, or burning pain localized deep in the ear induced by sound exposure. Pain can linger for days, weeks or longer after sound exposure.
  Click to Show: Ear Pain Descriptions
  - Sound is abrasive
  - Stabbing pain, sharp pain
  - Rattling pain
  - Dull ache, soreness
  - Headache in ear
  - Acid in ear, Burning
  - Simultaneous cool and hot sensation in ear
  - Coherent pain, as if from wound
  - Thumb in wound

- Pain radiating to outer ear, cheek, scalp, jaw, teeth, front portion of tongue, maxillary sinus and other areas innervated by the trigeminal nerve.
- Tickling or itching sensation in the ear.
- Autophony (own voice sounds boomy). Commonly caused by Patulous Eustachian Tube dysfunction (PET). Some consider this to be an associated symptom of Tonic Tensor Tympani Syndrome (TTTS).
- Muffled hearing and tympanic flutter. Symptoms commonly associated with TTTS.
- Headache.
- Unsteadiness or disordered balance.
- Distortion.
- Clicking, thumping, popping or crackling sounds near the ears. Can occur during specific actions such as when speaking or swallowing. Can also occur spontaneously. Stapedius myoclonus, tensor tympani myoclonus and palatal myoclonus are potential causes.
- Sore throat after sound exposure.
- Facial twitching from sound near eyes, cheek, or mouth.



*Frequency Selectivity*

From the cochlea to the auditory cortex, the central auditory system is spatially divided into frequency tuned regions from low to high frequencies. This arrangement of specific processing locations for specific frequencies is called *tonotopic mapping*.

As a result of tonotopic mapping, damage to the cochlea results in damage to specific frequency regions. However, as described in <u>Audiometric Traits</u>, loudness discomfort levels of hyperacusis patients are generally similar across frequency (as opposed to hearing sensitivity tests which often show notches or slopes). It is unlikely that the cochlea could be damaged uniformly across frequency from sound so the next question is, does the hyperactivity triggered by cochlear damage stay confined to the frequency regions where damage occurred?

The short answer is no. There have been several experiments that show cochlear damage to one frequency region can result in changes in neural activity in other frequency regions. This is thought to be a consequence of *lateral inhibition*. In the plot below, a single tone caused cochlear damage at 2 kHz (middle), resulting in changes in activity at both lower frequencies (left) and higher frequencies (right) in the auditory cortex and inferior colliculus (midbrain).

With these results in mind, it is then possible that damage and hearing loss at the more vulnerable cochlear regions (above 8 kHz) could reduce loudness tolerances at lower frequencies. It is unfortunate that hearing tests generally don't test above 8 kHz. While this shows processing of frequencies outside of damaged regions can become hyperactive, these results alone do not show that LDLs will be similar across the full frequency range commonly measured (up to 8 kHz).

Another interesting interpretation which is supported by multiple studies is that each processing level of the auditory system responds differently. As a result, it is possible that sounds at low and mid frequencies can be sensed as equally loud in the auditory cortex while there could be significantly more activity in the midbrain at lower frequencies after damage. If pain and loudness are processed at different levels within the auditory system, it is possible that pain sensations could be triggered before loudness sensations develop.

**Linking Hyperactivity to Pain**

The link between loudness and pain is currently unknown. As described in <u>Pain Thresholds</u>, pain from high intensity sound is normal and some suspect that those with hyperacusis have this pain triggered prematurely. The big questions are where is this pain signal generated, where is it processed, and how is it eventually sent to the pain centers of the brain?

The most simple, robust, and common way that pain signals are generated throughout the body is through sensing of cellular damage. As described in <u>Inner Ear: Pain Receptors</u>, traditional pain receptors have not been found in the cochlea however recent evidence suggests there is a type of nerve in the cochlea that is behaving like a pain receptor. These suspected pain receptors are routed from the cochlea to the granule cells of the cochlear nucleus (the auditory system's first processing center). Wherever the pain signal is generated it would need to be processed. It is feasible that a hyperreactive pain processing center could reduce pain thresholds and create the sensation of localized pain in the ears. There may also be a scenario similar to phantom limb pain where the disconnection of pain receptors results in hyperactivity of pain processing centers (phantom limb patients sometimes report a burning sensation in the referred area just as hyperacusis patients sometimes do).

The recent hyperacusis literature review mentions the following about potential pain pathways:

> "Pain information ascends to the brain through two main pathways and is interpreted by different brain structures. One path goes from the spinal cord to the thalamus and ends in the somatosensory cortex, and the other goes from the brain stem to the insular cortex through the amygdala (Basbaum, Bautista, Scherrer, & Julius, 2009). Glutamate, an excitatory amino acid, is the main neurotransmitter in the pain pathway (Julius & Basbaum, 2001; Pappagallo, 2005). Changes in pain intensity are processed in contralateral somatosensory and insular cortex (Rainville, 2002), but the anterior cingulate cortex is the main area thought to be responsible for the interpretation of the emotional significance of the noxious input (Rainville, Duncan, Price, Carrier, & Bushnell, 1997). The brain has a descending pathway that involves the peri-aqueductal gray and anterior cingulate. These pathways are thought to regulate the pain-related effects, such as analgesia and behavioral responses (Fields, 2000; Rainville, 2002)."

-A Review of Hyperacusis and Future Directions by Tyler, Pienkowski, et al.

General ear pain (pain not worsened by sound) can occur in both hyperacusis and tinnitus patients alike after an acoustic shock. This has been associated with the set of middle ear related symptoms called <u>tonic tensor tympani syndrome (TTTS)</u>. It has been suggested this pain and possibly sound induced pain occurs when the brain initiates unusual, hyperactive control of the middle ear muscles (tensor tympani and stapedius). As described in <u>Potential Mechanisms: Middle Ear</u>, there are unanswered questions if this is to be used to explain pain hyperacusis.

Pain is complicated and involves processing and feedback throughout the central nervous system. Further research into the cause of sound-induced pain specifically rather than loudness perception alone would provide much insight on pain hyperacusis.

### References

Anari M, Axelsson Alf, Eliasson A, Magnusson L. Hypersensitivity to Sound: Questionnaire data, audiometry and classification. *Scand Audiol* 1999:28:219-230

LAST PAGE (6 of 6 rec 6-29-16)
PAGE 110

P 110

# EXHIBIT C

In re: PF Lazor
_____/

## AFFIRMED DECLARATION OF DALE CLINTON WEATHERFORD, JR.
### RE: BRUTALITY AGAINST PRISONER PF LAZOR

First being duly deposed, I declare the following is true and correct:

1. My name is Dale Clinton Weatherford, Jr., I'm incarcerated at California State Prison—Los Angeles County (CSP-LAC), D-Facility. My prison number is C-71957; cell number is D2-222. I originally made this declaration, almost identically, in April 1985 while a prisoner at California Mens Colony (CMC), and have reviewed that old declaration, now, to confirm certain details.

2. On April 11, 1985 in the CMC A-Quad building-2 dining hall, I witnessed an incident of violence by a prison guard against PF Lazor as follows:

3. Approximately 6:35 pm, I was standing in the food service line about six people behind PF Lazor, prisoner #C-73842, who was at the head of the line. We were waiting to get "seconds" per prison policy. The food officer gave us the go-ahead to move ahead to be served.

4. Commotion at the front of the line caught my eye as Sergeant Lemon approached Lazor without any visible prompting. He came briskly and began yelling at Lazor, something to do with him getting food "seconds." I've watched Lazor get selectively harassed before by various guards for attempting to get seconds of food, although I and many others do, under the approved policy and practice on a daily basis at CMC. I've never seen Lazor cause nor provoke any of the harassment, including the incident of this date.

5. Lazor backed up in a retreating manner from Sgt. Lemon's aggression, as the rest of the line backed up accordingly as Lemon agressed more at Lazor, yelling louder as he approached. Lazor gestured passively that he'd done no wrong, with a tray of food in his left hand, as Lemon's hand darted to Lazor.

6. Lemon then yelled at Lazor, "put your tray down" "and go to your cell and lock up!". Lazor complied, putting his tray on the counter. Before he could move far, Lemon grabbed him by the neck with one hand and by the arm or shoulder with the other hand, and pulled Lazor across the dining floor sort of running him to the door and out the door. Lemon was yelling in a rage as though having lost control of himself, "Don't ever yell at me again!! -- if you ever yell at me again I'll throw you off from here!!" The dining door exited into a landing which was one or two stories above the ground level of concrete below.

7. I saw every part of the incident, close up and clearly and Lazor had never yelled at Lemon at all; I was just feet away and heard him say nothing at all. There were also no gestures by Lazor indicating yelling or asserting himself in any manner. I rapidly walked close to the exit door so was very

1                                          WEATHERFORD DECLARATION/LAZOR

close to the incident the entire time.

8. Lemon kept yelling very loudly in an apparent rage, that he was going to throw Lazor over the guard rail onto the pavement below. He had Lazor's whole body part way over the railing with Lazor's feet off the pavement landing, Lazor's hands and arms bracing himself from going over the rail, as Lemon kept yelling "I'm going to throw you off!!" several times. I glanced back to the food line officer who just stood with a stunned, shocked look on her face as if in shock at what she was seeing as she also watched Lemon's actions.

9. Lazor then pushed free from the railing, barely having kept from going over head first. Lemon then proceeded to push Lazor down the stairs. A yard officer came running up the stairs and he or another officer there (possibly Officer Almager) stepped between Lemon and Lazor. He appeared to be telling Sgt. Lemon to stop his actions, while actually restraining him somewhat. Lemon seemed to snap out of his flipped out state and spontaneously ordered his understaff officers to lock Lazor in his cell. Lemon yelled he was going to "write him up," which is the standard phrase for writing a CDC-115 rule violation report against a prisoner for a rule violation.

10. During the entire incident Lazor did absolutely nothing warranting a writeup. He was just standing there, going by the rules, obeying the food officer's directives. Lazor did not even defend himself against the brutality.

11. I learned shortly thereafter that Lazor was released from his "lockup" status in his cell. About an hour later he was outside on a bench and we spoke. As we did, Sgt. Lemon approached close, gave us an icy stare, and appeared to me to be listening into our conversation. Lazor had a visible red, fresh-looking scratch on the right of his neck about 1½-2 inches long which he related was made by Lemon grabbing him around the jaw and neck on the landing.

II

12. Two days later, on April 13, 1985, I was paged to the A-Quad office and ushered in by Sgt. Lemon. Lt. Caroway and a counselor walked in, whereupon Lemon said "Lets go to the back," as if for secrecy. We walked into and out of another occupied office, then into the empty office of Counselor Dykes. Lemon ordered me to close the door, secretively. I complied. Lemon then asked me if I planned to file a complaint against him for the April 11 Lazor incident. I responded "No." Lemon replied, "Well, I have it on good authority from a couple of sources that you are filing a petition against me..." in a threatening manner. He stated "I want you to know that I have profusely apologized on many occasions to Lazor, since the incident, acknowledging that I was in the wrong, and that nothing was going to happen to him, and as far as I am concerned, the issue is dead." Lemon then pumped me for more answers as to whether Lazor planned to file a CDC-602 administrative complaint about it. I replied that Lazor stated the issue was to be considered a dead issue at this time.

I declare and affirm under penalty of perjury that the foregoing is true and correct based on my own personal knowledge.

Date: December 19, 2001
(Nunc Pro Tunc to, April 28, 1985)
County of Los Angeles, California

Dale Clinton Weatherford, Jr.
CSP-LAC State Prison, Lancaster

2                                    WEATHERFORD DECLARATION/LAZOR

# DECLARATION OF GONZALO ROBERT GONZALES

I, Gonzalo Robert Gonzales, do depose and say the following:

1. My name is Gonzalo Robert Gonzales, and I am incarcerated at California Mens Colony (CMC) prison; my prison number is C-74420, and cell number is 2135.

2. On the date of April 11, 1985 at approximately 6:35 pm, I personally eye-witnessed an occurance of violence at CMC.

3. At said time, I was in the A-Quad dining hall standing in the seconds food line in the process of getting food for dinner, at the beginning of the incident which I witnessed, as follows:

4. PF Lazor, C-73842, was also in the seconds food line about 3 people, about 4 feet in front of me. We were approved by the officer at the end of the serving line to advance to get our food; Lazor was in the front of the seconds line after the servers had left the line to eat. A-Quad Sgt. Lemon approached the food line angrily yelling, and singled Lazor out, vulgarly yelling at him and yelling out his name "Lazor", several times, while thrusting his finger into Lazor's facial area, as Lazor backed up to avoid getting poked in the face. Lemon then took his fingers and began jabbing Lazor in the chest while yelling in a rage, pushing Lazor against the counter. Lemon demanded that Lazor set his food filled tray down and not eat, which Lazor did. Immediately thereupon, Lemon grabbed Lazor with both hands and dragged him accross the dining hall to the door while yelling his name "Lazor", and other shouts. I left the line and immediately followed Lemon dragging Lazor out the open door of the dining hall to observe, watch and listen. Lemon threw Lazor against the rail and began to force him over the rail, lifting him off the ground and pushed him (Lazor) half way over the railing, with Lazor's head facing toward the concrete below, 1 or 2 stories down. While doing this, Lemon was yelling "I'm going to throw you over the rail...", while swearing at Lazor, who was bent over the railing.

I saw Lazor block himself against the railing when first thrown against it, and now appeared to be pushing back against Lemon to avoid going over. Lazor pushed back with his body twice in order to avoid what appeared to be, being thrown over the railing and off the tier. Officer Almager intervened with his body between Lazor and Lemon after Lazor's second attempt to stop it himself.

Lemon then grabben Lazor by the jaw and began jerking his head, yelling "common hit me...!!"- He yelled this to Lazor 3 times that I heard. Lemon's hand lowered to Lazor's neck, while Lemon jerked around Lazor's neck. Lazor pulled free, and said "I'm not going to be stupid enought to hit you...". Lemon tried to coax Lazor to violence several times, and Lazor remained physically passive.

Lemon then ordered Officer Almager, and another male officer to "lock him up in his cell", regarding Lazor.

5. Lemon came back into the dining hall, and I heard him and female Officer Young talking. Officer Young told Lemon, "you didn't have to act like that to him (to Lazor), look at all the people who saw you". She told Lemon she had already

PAGE 2 OF 2 PAGES

DECLARATION OF GONZALO R. GONZALES

given the O.K. for Lazor and other convicts to advance through the seconds food line.

6. On the evening of April 11, Lazor and I and a few other convicts were talking outside building in A-Quad, and Sgt. Lemon came close by, appearing to listen into our conversations. Some of these convicts were shortly thereafter, marched into the A-Quad office and questioned about whether they were discussing the above-stated incident with Lazor, and that they (Sgt. Lemon and Officers) would pressure and make life tough for anyone who spread word or talked to Lazor about witnessing what occurred. Some of this information I learned from other convicts who we were conversing with, and some I saw myself but could not hear Lemon's actual words with these pressured convicts.

7. On Friday, April 12, 1985, I spoke with Lazor about witnessing the incident as stated above. We were on the Quad bench near the exit gate. Officers Brownley and another Officer saw us talking, and as I left, I saw and heard Brownley call Lazor over, and interrogate him about what he was talking to me about. The interrogation was not a normal one, and seemed to be bent to the subject of the incident stated above with Sgt Lemon.

8. Both on April 11, and after, I observed scratches (fresh on April 11) on the right side of Lazor's neck, and other bruise type markings, where I saw Lemon grab Lazor by the neck.

9. I declare that everything stated herein is true of my own personal knowledge, except as to those things which I clearly designated were told to me in Number 6, above, and those I believe to be true based on surrounding factual circumstances. I have not been influenced in any way to taint my knowledge of these facts. Lazor has been very firm about not being suggestive in any way with my testimony in our conversations. He wrote my testimony in handwriting, and then later brought back a typed version of the same for me to sign, which I willingly volunteered to sign.

I declare that the foregoing is true and correct, under penalty of perjury.

DATED: _4-19-85_                    _Gonlo Robat Hosle_
                                    GONZALO ROBERT GONZALES
                                    C-74420

## DECLARATION OF RUBEN GARCIA

I, Ruben Garcia, do depose and say the following:

1. My name is Ruben Garcia, and I am incarcerated at California Mens Colony (CMC) prison; my prison number is C-72624, and cell number is 2399.

2. On April 11, 1985, approximately 6:30 pm after dinner, I was standing on the ground-level track in A-Quad at CMC, approximately in front of the A-Quad Office.

My attention was drawn to the dining room overhang directly above me, or above and to my right, due to commotion taking place there. Upon looking up, I saw A-Quad Sgt. Lemon and inmate Lazor, C-73842, standing apart from each other as I looked up. Then I saw Lemon grab Lazor with his hand, just under Lazor's chin, so that Lemon had a firm hold of Lazor's jaw and neck. Lemon then pushed Lazor toward the stairway which goes down; and while in this process yelling to Lazor: "Go ahead Lazor, hit me."

Lazor stated to Lemon: "You know I'm not going to hit you Lemon."

I could hear this dialog very clearly from where I stood, and I also could observe quite definately that Lemon's inclination and actions were to throw Lazor down the stairs if Lazor had made any move toward Lemon, such as to obey Lemon's order for Lazor to hit Lemon. It was quite clear that Lemon was provoking and inciting Lazor into striking or otherwise aggression on Lemon, perhaps in defense.

However, I observed with distinction, that Lazor remained 100% passive throughout the entire time that I observed the incident. He made no movement whatsoever which could be deemed as defensive or aggressive.

3. Then I watched as 2 other officers who were standing next to Lazor & Lemon, take Lazor to Building 2 in A-Quad. I could not hear at this point if these officers were ordered by Lemon to take Lazor, or not.

4. I declare that everything stated herein is true of my own personal knowledge, and that my testimony has not been tainted in any way by anyone. Lazor has been fair and careful to avoid influencing or being suggestive in any way as we talked, regarding my statements of what I witnessed. Lazor handwrote what I stated, then left my presence, and later returned to me with this typed version of the same statements I had given to him, which I have willingly agreed to voluntarily sign and testify to.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: 4-22-85

RUBEN GARCIA   C-72624

Free Lazor  C-73842
Box 1050  ~~37-106~~ 05-126
Soledad, California 93960-1060
Layman at law, without counsel

Free Lazor,

No.  2:16-cv-0461  CKD  p  (TKB)

vs.

**PROOF OF SERVICE**

DAVID S. WILDMAN, ET AL.      /

**BY AFFIDAVIT**

I, Free Lazor, an adult party to this action, affirm by affidavit that I served the below-named parties on the date entered below, by delivering (to prison officials for delivery) into the United States mail system with prison provisions for first-class postage affixed thereto, the following document(s) accompanying this Proof of Service:

AMENDED / CORRECTED
1. OBJECTIONS TO MAGISTRATE JUDGES FINDINGS AND RECOMMENDATIONS, AND REQUEST FOR AN EVIDENTIARY HEARING

2.

3.

4.

5.

PARTIES SERVED:

Kamala Harris
Attorney General of California
Attn:
1300 I St., #125
Sacramento, CA  94244-2445

I, Free Lazor, the undersigned, first being put under affirmation, attest, subject to penalties for perjury, that the foregoing is true of my own knowledge.

Dated    7-18-16

Free Lazor, Affiant